UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ANTONIO LAVON DOYLE,

    Petitioner,

v.

TIMOTHY FILSON, *et al.*,

    Respondents.

Case No. 3:00-cv-00101-RCJ-WGC

ORDER

Introduction

    This action is a petition for a writ of habeas corpus by Antonio Lavon Doyle, a Nevada prisoner sentenced to death. The case is fully briefed and before the Court for resolution of Doyle's motion for an evidentiary hearing and adjudication of the merits of the claims remaining in Doyle's second amended habeas petition. The Court will deny Doyle's motion for an evidentiary hearing, deny Doyle's habeas petition, and grant Doyle a certificate of appealability with respect to certain issues.

Background

    In its opinion on Doyle's direct appeal, the Nevada Supreme Court described the factual background of this case as follows:

> On January 16, 1994, the nude body of twenty-year-old Ebony Mason was discovered some twenty-five feet off the roadway in an unimproved desert area of Clark County, Nevada. The woman's body was found lying face down with hands extended overhead to a point on the ground where it appeared some digging had occurred. A four-inch twig protruded from the victim's rectum. Three distinct types of footwear impressions were observed in the area, none of which matched the tread design of a pair of women's athletic shoes located on the nearby dirt road. Also observed in the area was a hole containing a broken condom, a condom tip, an open but empty condom package and two small packages of taco sauce.

1

In the opinion of the medical examiner, Mason died from asphyxia due to strangulation or blunt trauma to the head. The autopsy revealed nine broken ribs, multiple areas of external bruising, contusions, lacerations, abrasions, and a ligature mark on the anterior surface of the neck. Approximately 200 milliliters of fluid blood was found in Mason's chest cavity. Mason's back and chest bore a number patterned contusions consistent with footwear impressions found at the crime scene. Finally, the autopsy revealed severe laceration of the head and subarachnoid hemorrhage (a thin layer of blood surrounding the brain) indicating blunt force trauma to the skull. Laboratory analysis revealed traces of the drug PCP in Mason's system.

Michael Smith, who had been arrested in an unrelated matter, provided the police with the names of those he believed were responsible for the murder. Smith recounted statements made by Doyle regarding a killing to which Doyle claimed to have been a party. According to Smith, he and Doyle had overheard a girl tell some other people about her friend having been killed. At that time, Doyle commented to Smith that "we had to take someone out." Doyle further stated that he, Darrin Anderson, Shawn Atkins, and "Bubba" Atkins were at Anderson's house with a girl and that each had sex with the girl. While they were taking the girl home, she told the men that she was going to report them for rape and jumped from the truck in which they were riding. They were eventually able to coax the girl back into the truck and decided to kill her rather than face possible rape charges. The girl was apparently so inebriated or under the influence of drugs that she was oblivious to the direction the men were travelling. When they arrived at a remote area, the girl was pulled from the truck and choked. Unsuccessful in their attempt to choke her to death, the men then beat the girl. Finally, Doyle told Smith, two of the men held the girl down while the other repeatedly dropped a brick on her face until she died.

With information obtained from Smith, the police contacted Darrin Anderson, the owner of a small, yellow pickup truck. According to Anderson, on the night of January 15, 1994, he was present with Doyle at the home of Shawn and "Bubba" Atkins. After arriving, the four left the Atkins residence to attend a nearby party. Anderson returned alone to the Atkins residence a short time later, and the other three returned thereafter in the company of Ebony Mason, who appeared inebriated or under the influence of drugs. Later, Mason asked for a ride home, and Anderson suggested that Doyle use Anderson's truck. At approximately 10:30 p.m., Doyle left with Mason and the Atkins brothers in Anderson's truck. Anderson awoke the next morning to find Doyle and the Atkins brothers asleep at the Atkins residence. When police later searched Anderson's truck, they found a pair of blood-stained white socks between the seats.

Further information led investigators to contact Mark Wattley, another of Doyle's friends. Wattley was present during a conversation where Doyle made statements describing how Shawn Atkins was unable to subdue Mason and how "Bubba" Atkins intervened "and hit her with a head punch and dropped her." Thereafter, Doyle told Wattley that he (Doyle) began kicking Mason in the head. Eventually, one of the men grabbed a brick or rock and hit the girl in the head. At one point in the conversation, Doyle demonstrated how he (Doyle) jumped in the air and caused both of his feet to come down on Mason during the beating.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

The police investigation eventually led to the execution of a search warrant at Doyle's residence. During the search, the police impounded a pair of Adidas athletic shoes with soles that apparently matched treadwear impressions found at the crime scene and on Mason's body. Doyle was then placed under arrest. After being advised of his *Miranda* rights, Doyle provided a statement to police explaining that he had been present when Mason was killed but that he did not participate in the killing. Later analysis of the impounded shoes confirmed that the treadwear impressions were consistent with the footwear impressions retrieved from the scene of the crime and observed upon Mason's body.

At trial, Doyle testified that on the night of January 15, 1994, "Bubba" Atkins brought Mason to the Atkins residence. Some time after her arrival, Mason asked for a ride downtown or home. Anderson then instructed Doyle to take Anderson's truck and take Mason home. Doyle testified that Mason wanted to engage in sex with him and the Atkins brothers, so all four drove to Doyle's apartment where each of the men had sex with Mason. Thereafter, the four left Doyle's apartment in Anderson's truck. Mason was riding in the back of the truck, and at some point, the truck stopped at a red light, and Mason jumped out of the truck. The Atkins brothers were eventually able to get Mason back in the truck, and the four proceeded to a deserted area outside Las Vegas.

Doyle further testified that, once stopped, Shawn Atkins hit Mason in the face and a fight ensued. When it appeared that Shawn Atkins was unable to subdue Mason, "Bubba" Atkins came to his aid. Doyle denied any participation in the beating or killing, stating that he had watched from the back of the truck as Shawn and "Bubba" Atkins beat and kicked the girl. Later, while he and Shawn Atkins attempted to push start the truck, Doyle testified that he saw "Bubba" Atkins standing over Mason with a brick raised overhead. "Bubba" Atkins later discarded the brick in a garbage can. According to Doyle, "Bubba" Atkins was wearing the athletic shoes impounded by the police from Doyle's apartment.

18
19

*Doyle v. State*, 112 Nev. 879, 884–87, 921 P.2d 901, 905–07 (1996) (a copy of the

Nevada Supreme Court's opinion is filed in the record as Exh. 225 (ECF No. 174-7)).

20
21
22
23
24
25
26
27

On January 12, 1995, a jury found Doyle guilty of first-degree murder, conspiracy

to commit murder, first-degree kidnapping, and sexual assault. *See* Verdicts, Exh. 155

(ECF No. 172-11). Following a penalty hearing, the jury voted to impose the death

sentence for the murder. *See* Verdict, Exh. 169 (ECF No. 173-10, p. 13). On May 23,

1995, the trial court sentenced Doyle to death for the murder. *See* Judgment of

Conviction, Exh. 157 (ECF No. 173-2). The court sentenced Doyle to six years in prison

for the conspiracy to commit murder, life in prison with the possibility of parole for the

kidnapping, and life in prison with the possibility of parole for the sexual assault; the life

28

sentences run consecutively to the death sentence and to one another, and the six-year sentence runs concurrently with the other sentences. *See id.*

Doyle appealed. *See* Appellant's Opening Brief, Exh. 172 (ECF No. 173-10, pp. 20–64). The Nevada Supreme Court reversed the sexual assault conviction, finding that there was insufficient evidence to show beyond a reasonable doubt that the victim was alive when the sexual assault occurred. *See Doyle*, 112 Nev. at 895–900, 921 P.2d at 912–15. The Nevada Supreme Court affirmed Doyle's convictions of first-degree murder, conspiracy to commit murder, and first-degree kidnapping, as well as the sentences relative to those convictions. *See id.*, 112 Nev. at 902–03, 921 P.2d at 916. The court denied rehearing on June 23, 1997. *See* Order Denying Rehearing, Exh. 175 (ECF No. 173-10, p. 92).

Doyle then filed a petition for writ of habeas corpus in the state district court on June 26, 1997. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 176 (ECF No. 174, pp. 2–41); Memorandum of Points and Authorities in Support of Petition for Post-Conviction Relief, Exh. 177 (ECF No. 174, pp. 43–67). The court held an evidentiary hearing. *See* Transcript of Evidentiary Hearing, Respondents' Exh. 3 (ECF Nos. 209-4, 209-5). The court denied the petition on October 1, 1998. *See* Findings of Fact, Conclusions of Law and Order, Exh. 181 (ECF No. 74, pp. 94–98). Doyle appealed. *See* Appellant's Opening Brief, Exh. 182 (ECF No. 174-2, pp. 2–39). The Nevada Supreme Court affirmed on February 3, 2000. *See Doyle v. State*, 116 Nev. 148, 995 P.2d 465 (2000) (a copy of the Nevada Supreme Court's opinion is filed in the record as Exh. 184 (ECF No. 174-3, pp. 2–18)).

Doyle initiated this federal habeas corpus action on February 28, 2000, by submitting a *pro se* petition for writ of habeas corpus (ECF No. 4). The Court appointed counsel for Doyle. *See* Order entered May 2, 2000 (ECF No. 3). Doyle filed a first amended habeas petition on May 14, 2008 (ECF No. 168).

Respondents moved to dismiss the first amended petition, arguing that it contained claims that were unexhausted in state court (ECF No. 208). In response,

Doyle moved for a stay, to allow him to exhaust his claims in state court before proceeding with this action (ECF No. 218). On December 18, 2009, the Court granted Doyle's motion, and stayed this action; the Court denied the motion to dismiss as moot. *See* Order entered December 18, 2009 (ECF No. 230).

On July 24, 2009, Doyle filed, in the state district court, a second state petition for writ of habeas corpus. *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exh. 295 (ECF No. 265-3). On February 14, 2013, the court dismissed the petition, finding it barred by the statute of limitations (NRS § 34.726) and the laches doctrine (NRS § 34.800). *See* Findings of Fact, Conclusions of Law and Order, Exh. 300 (ECF No. 266-2). Doyle appealed. *See* Appellant's Opening Brief, Exh. 301 (ECF No. 266-3). The Nevada Supreme Court affirmed on September 22, 2015. *See* Order of Affirmance, Exh. 304 (ECF No. 266-6). The court denied rehearing on December 2, 2015. *See* Order Denying Rehearing, Exh. 306 (ECF No. 266-8). The United States Supreme Court denied certiorari on May 2, 2016. *See Doyle v. Nevada*, 136 S.Ct. 1829 (2016).

This Court lifted the stay of this action on June 28, 2016 (ECF No. 258). On October 28, 2016, Doyle filed a second amended petition for writ of habeas corpus (ECF No. 265), which is now his operative petition. Doyle's second amended petition asserts the following claims:

> 1.      "[P]rosecutors excused prospective jurors on the basis of race," in violation of Doyle's federal constitutional rights. Second Amended Petition (ECF No. 265), pp. 11–35.

> 2.      Trial counsel were ineffective, in the penalty phase of the trial, in violation of Doyle's federal constitutional rights, for "failing to investigate and present mitigating evidence." *Id.* at 35–97.

> 3A.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to object to improper victim-impact testimony during the guilt phase of trial." *Id.* at 98–100.

> 3B.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to object to prosecutors' misrepresentation of facts regarding the [Edwards] homicide." *Id.* at 100–06.

> 3C.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to object to prosecutors' use of gender to excuse prospective juror Emma Samuels." *Id.* at 106–08.

3D.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to seek exclusion of hearsay statements." *Id.* at 108–10.

3E.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to prepare Mr. Doyle for his testimony." *Id.* at 110–11.

3F.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, for failing "to clarify when they could not hear or understand the trial judge." *Id.* at 111.

3G.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to move to suppress the evidence recovered as a result of the search warrant." *Id.* at 111–18.

3H.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to object to the introduction of a pair of stained pants without any explanatory testimony." *Id.* at 118–20.

3I.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to object to prejudicial and multiple enlarged photographs of the victim." *Id.* at 120–21.

3J.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, for failing "to present evidence impeaching Michael Smith's testimony." *Id.* at 121–23.

3K.     Trial counsel were ineffective, in violation of Doyle's federal constitutional rights, "for failing to request an instruction for the lesser-included offense of second-degree kidnapping." *Id.* at 123–24.

4.     In violation of Doyle's federal constitutional rights, "the prosecutor introduced statements made by Mr. Doyle's codefendant without affording Mr. Doyle the opportunity to cross-examine …." *Id.* at 125–27.

5.     Doyle's federal constitutional rights were violated "because of the admission of impermissible and unduly prejudicial victim-impact evidence." *Id.* at 128–37.

6A1.     Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor improperly argued about mercy." *Id.* at 139.

6A2.     Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor misled the jury about life with parole sentencing." *Id.* at 140–41.

6A3.     Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor mislead the jury about mitigation." *Id.* at 141–42.

6

6A4.   Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor improperly expressed his opinion about the propriety of the death penalty." *Id.* at 142.

6A5.   Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor scared the jury into sentencing Mr. Doyle to death." *Id.* at 143.

6A6.   Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor improperly equated the death penalty with self-defense." *Id.* at 144.

6A7.   Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor misled the jury about Mr. Doyle's involvement in a drive-by shooting." *Id.* at 144–45.

6A8.   Doyle's federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor misrepresented the testimony of Gary and Maria Mason." *Id.* at 145–47.

7.   Doyle's federal constitutional rights were violated "because the prosecutors failed to disclose material evidence under *Brady v. Maryland*, and knowingly presented false testimony in violation of *Napue v. Illinois*." *Id.* at 148–69.

8E1.   Doyle's federal constitutional rights were violated because "Mr. Doyle cannot be guilty of both first-degree kidnapping predicated on murder and first-degree murder predicated on kidnapping." *Id.* at 176–79.

8E2.   Doyle's federal constitutional rights were violated because "[t]he invalidity of Mr. Doyle's sexual assault conviction invalidates his first-degree kidnapping and first-degree murder convictions." *Id.* at 179–83.

8E3.   Doyle's federal constitutional rights were violated because "[t]he Nevada Supreme Court improperly reweighed Mr. Doyle's aggravating and mitigating circumstances after striking the kidnapping aggravating circumstance." *Id.* at 183–87.

9A1.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court failed to properly instruct the jury as to the elements of first-degree premeditated and deliberate murder." *Id.* at 188–94.

9A2.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court's reasonable doubt instruction was improper." *Id.* at 194–96.

9A3.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court's malice aforethought instruction was improper." *Id.* at 196–97.

9A4.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court's specific intent instruction was improper." *Id.* at 197–200.

9A5.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court's guilt or innocence instruction was improper." *Id.* at 200–01.

9A6.   Doyle's federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he kidnapping instructions reduced the state's burden of proof, allowing the jury to find first-degree kidnapping based merely on second-degree kidnapping." *Id.* at 201–06.

9B1.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court improperly answered the jury's question regarding comparative culpability." *Id.* at 207–09.

9B2.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court improperly failed to give the presumption of life instruction." *Id.* at 209–11.

9B3.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court's reasonable doubt instruction was improper." *Id.* at 211.

9B4.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court's *Edmund* instruction was improper." *Id.* at 211–13.

9B5.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court improperly failed [to] instruct the jury to find mitigating circumstances did not outweigh aggravating circumstances beyond a reasonable doubt." *Id.* at 213–16.

9B6.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court improperly failed to give the jury a form to indicate a finding that mitigating circumstances outweighed aggravating circumstances, creating an unconstitutional presumption of death." *Id.* at 216–21.

9B7.   Doyle's federal constitutional rights were violated, in the penalty phase of his trial, as a result of improper jury instructions, because "[t]he trial court's anti-sympathy instruction was unduly prejudicial." *Id.* at 221–22.

10.   Doyle's federal constitutional rights were violated as a result of "the trial court's failure to record critical proceedings." *Id.* at 223–25.

11.   Doyle's death sentence is invalid, under the federal constitution, because "execution by lethal injection violates the constitutional prohibition against cruel and unusual punishments and his rights under the First and Fourteenth Amendments." *Id.* at 226–53.

12.    Doyle's death sentence is invalid, under the federal constitution, "because his death sentence is the product of purposeful race discrimination by state officials." *Id.* at 254–57.

13.    Doyle's conviction and sentence violate the federal constitution "because Mr. Doyle's capital trial, sentencing, and review on direct appeal were conducted before state judicial officers whose tenure in office was not during good behavior but whose tenure was dependent on popular election." *Id.* at 258–62.

14.    Doyle's death sentence is invalid, under the federal constitution, "because the Nevada capital punishment system operates in an arbitrary and capricious manner." *Id.* at 263–71.

15.    Doyle's death sentence is invalid, under the federal constitution, "due to the restrictive conditions on Nevada's death row." *Id.* at 272–73.

16.    Doyle's death sentence is invalid, under the federal constitution, "due to the jury finding the statutory aggravating circumstances that the murder was committed to avoid or prevent lawful arrest." *Id.* at 274–89.

17A.    Doyle's federal constitutional rights were violated because "[t]here was insufficient evidence for the jury to convict Mr. Doyle of conspiracy to commit murder." *Id.* at 290–93.

17B.    Doyle's federal constitutional rights were violated because "[t]here was insufficient evidence of first-degree kidnapping." *Id.* at 293–94.

18.    Doyle's death sentence is invalid, under the federal constitution, "due to the jury finding the statutory aggravating circumstances that the murder was committed by a person under sentence of imprisonment…." *Id.* at 296–97.

19.    Doyle's conviction and death sentence are invalid under the federal constitution "because of the cumulative effect of the errors in this case." *Id.* at 298–301.

Respondents filed a motion to dismiss (ECF No. 277) on March 10, 2017, arguing that various claims in Doyle's second amended habeas petition are barred by the statute of limitations, unexhausted in state court, procedurally defaulted, and not cognizable in this federal habeas corpus action. The Court granted the motion to dismiss in part and denied it in part. *See* Order entered May 23, 2018 (ECF No. 301). The Court determined that certain of Doyle's claims are barred by the statute of limitations and that certain of his claims are barred by the procedural default doctrine. *Id.* The Court dismissed the following of Doyle's claims: the ineffective assistance of

appellate counsel claim in Ground 1; Grounds 2, 3A, 3B, 3C, 3D, 3F, 3K, 4, 5, 6A1, 6A2, 6A3, 6A4, 6A5, 6A6, 6A7; all of Ground 6A8 except the ineffective assistance of trial counsel claim; and Grounds 7, 8E1, 8E2, 8E3, 9A2, 9A4, 9A5, 9A6, 9B1, 9B2, 9B3, 9B4, 9B5, 9B6, 9B7, 10, 11, 12, 13, 14, 15, 16 and 18. *Id.* This left the following of Doyle's claims to be adjudicated on their merits: Ground 1, other than the claim of ineffective assistance of appellate counsel; Grounds 3E, 3G, 3H, 3I, and 3J; the claim of ineffective assistance of trial counsel in Ground 6A8; and Grounds 9A1, 9A3, 17A, 17B and 19. *Id.* On April 17, 2019, Doyle filed a motion for reconsideration of the May 23, 2018 order (ECF No. 320). The Court denied that motion on October 7, 2019 (ECF No. 331).

On December 18, 2018, Respondents filed an answer (ECF No. 309), responding to the remaining claims in Doyle's second amended petition. Doyle filed a reply to Respondents' answer on April 17, 2019 (ECF No. 322). Respondents filed a response to Doyle's reply on January 6, 2020 (ECF No. 337).

With his reply, on April 17, 2019, Doyle filed a motion for evidentiary hearing (ECF No. 323). Respondents filed an opposition to that motion on January 6, 2020 (ECF No. 336). Doyle filed a reply on January 24, 2020 (ECF No. 339).

<u>Analysis</u>

<u>Standard of Review</u>

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003). 28 U.S.C. § 2254(d) sets forth the primary standard of review under the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (*quoting Williams*, 529 U.S. at 409). The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has also instructed that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (AEDPA standard is "a

difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted).

The state courts' "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When a state appellate court does not provide an explanation for its decision, the federal habeas court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991) (the federal court may look through to the last reasoned state court decision).

Where the state court summarily denied a claim but there is no reasoned state-court decision on the claim, a presumption exists that the state court adjudicated the claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100. In that case, a reviewing federal court "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

In considering a habeas petitioner's claims under section 2254(d), the federal court takes into account only the evidence presented in state court. *Pinholster*, 563 U.S. at 185–87.

The federal court's review is de novo for claims not adjudicated on their merits by the state courts. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Procedural Default and *Martinez*

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting

12

claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman*, 501 U.S. at 731–32 ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel. The *Coleman* Court had held that the absence or ineffective assistance of state post-conviction counsel generally could not establish cause to excuse a procedural default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–54. In *Martinez*, however, the Supreme Court established an equitable exception to that rule, holding that the absence or ineffective assistance of counsel at

an initial-review collateral proceeding may establish cause to excuse a petitioner's procedural default of substantial claims of ineffective assistance of trial counsel. *See Martinez*, 566 U.S. at 9. The Court described "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8.

On Doyle's direct appeal and the appeal in his first state habeas action, the Nevada Supreme Court addressed his claims on their merits. *Doyle*, 112 Nev. 879, 921 P.2d 901; Opinion, Exh. 184 (ECF No. 174-3, pp. 2–18). Therefore, claims asserted by Doyle on his direct appeal and on the appeal in his first state habeas action were not procedurally barred in state court and are not subject to the procedural default doctrine in this case. On Doyle's appeal in his second state habeas action, however, the Nevada Supreme Court ruled that his entire petition was untimely under NRS § 34.726 and barred by laches under NRS § 34.800. *See* Order of Affirmance, Exh. 304 (ECF No. 266-6). Therefore, claims exhausted by Doyle in state court only in his second state habeas action are subject to the procedural default doctrine.

In the May 23, 2018, order, the Court ruled that, under *Martinez*, Doyle might be able to overcome certain of his procedural defaults, but the Court declined to rule on the question of those procedural defaults until the merits of the claims were briefed. *See, e.g.*, Order entered May 23, 2018 (ECF No. 301), p. 25.

Standards Governing Claims of Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-part test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the

"wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated a claim of ineffective assistance of counsel under *Strickland*, establishing that the state court's decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.' [*Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam)].").

Ground 1

In Ground 1 of his second amended habeas petition, Doyle claims that "prosecutors excused prospective jurors on the basis of race," in violation of his federal constitutional rights. Second Amended Petition (ECF No. 265), pp. 11–35. In addition to Fourteenth Amendment claims, based on the holding in *Batson v. Kentucky*, 476 U.S.

79, 89 (1986), Ground 1 includes claims of ineffective assistance of trial counsel and ineffective assistance of appellate counsel. *See id*.

In the May 23, 2018, order, the Court dismissed the claims of ineffective assistance of appellate counsel in Ground 1 as procedurally defaulted. *See* Order entered May 23, 2018 (ECF No. 301), pp. 23–26. As for the claims of ineffective assistance of trial counsel in Ground 1, the Court determined that those claims are subject to the procedural default doctrine, but that Doyle might be able to overcome the procedural default under *Martinez. See id*. The Fourteenth Amendment claims were adjudicated on their merits in state court and are therefore addressed here under the AEDPA standard.

Under the Equal Protection Clause of the Fourteenth Amendment, a defendant has the right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 86–87. In *Batson*, the Supreme Court prescribed a framework for analysis of claims of violation of this right:

> In *Batson,* we outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. 476 U.S., at 96–98, 106 S.Ct., at 722–1724. The analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.,* at 96–97, 106 S.Ct., at 1722–1723. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.,* at 97–98, 106 S.Ct., at 1723–1724. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.,* at 98, 106 S.Ct., at 1723.

*Hernandez v. New York*, 500 U.S. 352, 358–59 (1991).

The *Batson* Court stated the following regarding the determination whether a prima facie case is established, satisfying the first step of the inquiry:

> The standards for assessing a prima facie case in the context of discriminatory selection of the venire have been fully articulated since [*Swain v. Alabama*, 380 U.S. 202 (1965)]. *See* [*Castaneda v. Partida*, 430 U.S. 482, 494–95 (1977); *Washington v. Davis*, 426 U.S. 229, 241–42 (1976); *Alexander v. Louisiana*, 405 U.S. 625, 629–31 (1972).] These principles support our conclusion that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely

16

on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida, supra,* 430 U.S., at 494, 97 S.Ct., at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." [*Avery v. Georgia,* 345 U.S. 559, 562 (1953).] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96–97.

If a prima facie case is made out, and the prosecution offers a race-neutral reason for the peremptory challenge, then, at step three of the *Batson* analysis, the petitioner has the ultimate burden of proving purposeful discrimination by a preponderance of the evidence. *See Batson*, 476 U.S. at 93; *Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016). The petitioner must show that race was a substantial motivating factor in the prosecutor's use of the peremptory challenge. *See id.* at 606.

In this case, the prosecution used peremptory challenges to excuse three jurors who might have been African-American. Respondents used their first peremptory challenge to excuse prospective juror Gwendolyn Velasquez. *See* Transcript of Trial, January 4, 1995, Exh. 446, p. II-86 (ECF No. 311-7, p. 90). Doyle's counsel objected, and the following exchange took place:

MS. HATCHER [defense counsel]:  Your Honor, for the record we would note that the State used its first peremptory challenge, and they challenged Ms. Velasquez, who I consider to be a minority. Under *Batson*

17

I would ask that the Court instruct the State, or that the State refrain from systematically excluding African/Americans. If it is for no other reason than for race, then I did not see another reason. And maybe the State can explain it as to why Ms. Velasquez was challenged.

THE COURT [Judge Addeliar D. Guy, III]:  Mr. Schwartz or Mr. Owens?

MR. SCHWARTZ [prosecutor]:  Your Honor, just for the record I believe Ms. Velasquez was the first juror challenged, so I don't [...] how we've established some kind of a pattern here. Had we excluded a white, perhaps it would have been a pattern of excluding Caucasians from this jury. I don't think we need to give a reason in this particular instance; but if the Court wants one, I'd be more than happy to address the Court. I just don't see any need at this time.

THE COURT:  I don't particularly want one. Ms. Velasquez might. If you want to make a record of it go ahead. At this stage of the game I'm not going to get involved with this, because I don't think that there's been any pattern made. This was the first peremptory challenge made; there are several other African/Americans. Let me rephrase. There are some of the people in the back who appear to be African/Americans.

I use the term African/American, because that is what's come into use in the last few years. And it's my understanding the reason why it has become in use, because many people who we used to call black did not want to be identified with African/Americans, because they were Cuban/Americans or Haitian/Americans or Jamaican/Americans and so forth and have since become citizens over here.

A lot of people said, "Ah, well, Thurgood Marshall first made that distinction." And since, henceforth, all my references will be to African/Americans who are formerly American Negroes. Ms. Velasquez has a Spanish surname, and I'll tell you folks that does not mean that she is Spanish, because I knew someone who has a Jewish surname and is Catholic. Her husband is Jewish, but she isn't. So we can't go by that anymore than you can go by an Irish female marrying an Italian and she now has an Italian surname.

For the benefit of the doubt and for the record, African/Americans run in all colors from pure white to pure black. They've been crossing the line for years. I would presume that Ms. Velasquez was an African/American for the sake of this argument only, but is the first one there. We've had two other African/Americans on this panel.

Mr. White was Juror No. 9, No. 167, was excused because on a challenge by the Defense, and rightfully so I thought, because he only would give a death penalty if found guilty. Strike that. He would only give a life without the possibility of parole and a death penalty if found guilty. He did not believe in life with the possibility of parole, because that was an undue burden, as he said, upon the taxpayer.

We also excused another juror, who never reached the stand. She was a—she had both, she was—at her request primarily because she was the amputee of her legs, and she was in a wheelchair. And she informed the Court that she would like to be excused because she couldn't sit for

long periods of time without being in pain and had to go to the bathroom frequently. We all agreed that she could be excused.

But that's as far as we go. And if this was the second or third person who had been excused peremptorily I would join quite readily with Ms. Hatcher's objection and have the State deal with it. But so far it's only been the one, and there are other African/Americans, who appear to be African/Americans, who are sitting in the back.

Motion will be denied at this time. Anything else?

MR. SCHWARTZ:  No, your Honor.

MR. HATCHER:  No, your Honor.

Id. at pp. II-88–II-91 (ECF No. 311-7, pp. 92–95).

As the jury selection proceeded, the trial judge cautioned the prosecution about

excusing prospective jurors based on race:

THE COURT:  I just want to give the Court's observations given during the last motion by the defense. Juror No. 1, Ms. Samuels, for all extents and purposes is an African/American, having been born in Lenore, Louisiana. And she will get number one spot. And we're just getting on to No. 3, Ms. Burns, who stood down and replaced Ms. Compau. But I will caution the District Attorney that if he continues, we may have to go on in Ms. Hatcher's motion.

Id. at II-154 (ECF No. 311-7, p. 158).

The prosecutors then used a peremptory challenge to excuse prospective juror

Emma Jean Samuels. See id. at II-212–II-213 (ECF No. 311-7, pp. 216–17). Doyle's

counsel objected and the following exchange occurred:

MS. HATCHER:  Your honor, this was our concern from the beginning when Mrs. Velasquez was excused with a peremptory challenge, and now the State has come through and done exactly what we anticipated I thought that they would do, and we would ask the Court to admonish them. It's fairly obvious that Mrs. Samuels is an African/American, and I would ask that the State go on the record and indicate the reason for excusing her other than race.

THE COURT:  Mr. Schwartz?

MR. SCHWARTZ:  Thank you, your Honor.

Your Honor, it's my understanding, and correct me if I'm wrong, that Mrs. Samuels was questioned I believe yesterday by both the State and the Defense. And she indicated a couple of things that were of concern to me at least.

First, that she had two young children, I think a twelve-year-old and a 14-year-old, and I was somewhat concerned in a capital case having a

mother of two young boys having to be put in a situation where should she convict the Defendant of first-degree murder, would she be in that frame of mind to sentence him to death, because that is certainly what the State would be asking.

THE COURT:  Don't we have other people who have the same problem?

MR. SCHWARTZ:  Yes, your Honor, we do. However there was a second point I was about to make with regard to Ms. Samuels. She testified, I believe, that her brother was serving a prison sentence in the state of Louisiana, I believe, and that she didn't know what the sentence was, but she was under the impression he was serving a sentence for first-degree murder.

Now, Mr. Doyle is being charged with murder, and the State is going to convict him and find him guilty of first-degree murder. I certainly, in my mind, would think Ms. Samuels is going to be thinking about her brother in relationship to what she should do here in this courtroom, and it might put a little too much pressure on that woman.

It had absolutely nothing to do with race, Judge. We could go through—I think we challenged five or six people, several of whom I think would excuse themselves who are members—who are African/Americans, and excuse themselves either because of the religious problems, or one, I believe, had a medical problem.

We've been at this for two days now, Judge, and I think maybe twelve people were excused. Mrs. Hatcher and Mr. Schieck, all their exclusions were I think members of the Caucasian race. I'm not saying that they're systematically excluding Caucasians, but that's just the way it happens.

Any other member of that jury panel, if they have a brother serving a life sentence in prison, you can rest assured, Judge, white, red, purple, or orange, I will move to exclude them. And that's why I excluded Ms. Samuels.

THE COURT:  I appreciate your argument except for the one about the Caucasians. The Caucasians are not the minority races. And they're not the minority on this panel. But I'm going to accept that excuse that you've given. I don't see any great form in it.

I do note that we do have another juror on the panel, being Ms. Brown sitting in Juror No. 3. I also note we have two or three jurors who are African/American—what appears to be African/American—jurors in the back. So we'll see what happens on this.

But I'd hate to have to find out that at the close of this jury that we do not have any African/American jurors on there.

Yes, Ms. Hatcher?

MS. HATCHER:  Your Honor, for the record, I understand that the Court has made its ruling; however, I want the record to be very clear that I believe that if Mr. Schwartz and Mr. Owens were going to do this that

they should have made a record before excluding Mrs. Samuels and put us in a position that if the Court had ruled that they were wrong, what are we going to do? Start all over with a brand new panel now?

And for the record I would ask that if this situation comes again that we make a record prior to that. And I understand the Court has made its ruling.

THE COURT:  All right. Ms. Hatcher, as was stated earlier, the first person—the first challenge that was made by the State was against an African/American. There is nothing in it at all to give the Court any idea of any pairing. And the Court isn't going to sit down and tell you who they're going to exclude any more than you have to sit down and tell them who you're going to exclude.

And I'm not concerned with that. I'm concerned only with the present. I don't have—and so far, as long as the reasons given are reasonable, I don't think I can go past it. These are peremptory challenges. The record is made.

*Id.* at II-214–II-217 (ECF No. 311-7, pp. 218–21).

Subsequently, during the selection of the alternate jurors, the prosecution used a peremptory challenge to strike Angeline Smith, who was apparently African-American. *See id.* at II-322 (ECF No. 311-7, p. 326).

The next day, following the first day of presentation of evidence by the State, Doyle's counsel moved for a mistrial, asserting that the prosecution used its peremptory challenges in a discriminatory manner. *See* Transcript of Trial, January 5, 1995, Exh. 447, pp. III-80–III-98 (ECF No. 311-8, pp. 84–102). The prosecution then stated its reasons for the peremptory strike of Smith:

MR. OWENS [prosecutor]:  The State need only express a racially neutral grounds for the exercise of peremptory challenge on this particular [prospective juror], Ms. Angela Smith. And there were a number of reasons to challenge Ms. Smith.

In her questionnaire, and I'm referring to question No. 33, she gave a response concerning the experience of family members and those close to her with the criminal justice system that is much broader than just her brother's convictions.

The question was, "Have you or any family member or close friend ever been arrested and/or charged with a crime?" The answer, "Yes." The explanation was, "My mother for Disturbing the Peace; my brother Wade, Violation of Probation; and Gary for traffic tickets." So she has had three immediate family members arrested by the police.

The incident with her brother she explained in the transcript. When she was asked by Mr. Schieck what he was on probation for her response was, "Just about everything." And I believe later on she had indicated in response to questioning that one of the charges was a robbery. She indicates that she still sees her brother on occasion.

Her mother was involved in an incident with the police, which this Ms. Smith indicated was at a time when the police acted rough and rude with her own mother. And then we have another brother Gary who was arrested on another occasion for traffic tickets.

The State has to assume in reading this type of a response that this person is going to harbor biases against the State; or if they don't even feel that they are at the time, they certainly might be provoked by certain things that occur in the court proceedings, such as a police officer testifying, or having to address the sentencing of another individual for a violent crime which is something that is very likely to occur in this case.

Before the selection of the jury in this case we looked at the questionnaires last week. They were reviewed by both myself and Mr. Schwartz. We assessed a ranking on each one of the prospective jurors of from one to five—five being the most favorable to the State and one being the least favorable. And this juror received a "one" rating by myself when I went through her questionnaire, and that was before I even knew anything concerning her particular race.

I think that that is a—there is more than one. There are several racially neutral reasons for excusing this juror.

*   *   *

I think the State had a racially neutral reason for exercising its challenge. And even on its facing the practice, anybody who had an individual with the type of experience that this young woman had had would have been excused by the State, color notwithstanding.

*Id.* at III-88–III-90 (ECF No. 311-8, pp. 92–94). Doyle's counsel argued as follows:

It is our position that using the fact that you have a family member who has been incarcerated in a prison is really a discriminatory criteria, because a much larger percentage of African/American individuals in Clark County, based on the percentage, have family members that are incarcerated in our prison system.

*Id.* at III-88 (ECF No. 311-8, p. 92); *see also, generally, id.* at III-81–III-88 (ECF No. 311-8, pp. 85–92). Doyle's counsel also argued that the prosecution did not use peremptory challenges to excuse non-African-American prospective jurors who had contacts with law enforcement, or who had family members who had contacts with law enforcement, or who expressed dislike for law enforcement. *Id.* at III-90–III-91 (ECF No. 311-8, pp. 94–95). The trial judge accepted the prosecution's race-neutral reasons for striking

Samuels and Smith and denied the defense's motion for a mistrial. *See id.* at III-92–III-98 (ECF No. 311-8, pp. 96–102).

Doyle's counsel then requested that the prosecutors be required to state their reasons for excusing Velasquez. *See id.* at III-92 (ECF No. 311-8, p. 96). The trial judge denied that request. *See id.* at III-92 (ECF No. 311-8, p. 96).

On his direct appeal, Doyle asserted his claim that the State's peremptory challenges of African-American prospective jurors violated his right to equal protection of the law under the Fourteenth Amendment and *Batson* (*see* Appellant's Opening Brief, Exh. 172, pp. 17–23 (ECF No. 173-10, pp. 41–47)), and the Nevada Supreme Court ruled as follows:

> *The Batson challenge.*
>
> Doyle, citing *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), claims that the State improperly used its peremptory challenges to remove black venirepersons from the jury pool in violation of his Fourteenth Amendment right to equal protection of the laws. The State contends that the reasons given for excluding the jurors were race neutral and did not constitute purposeful discrimination.
>
> *Batson* and its progeny set forth a three-step process for evaluating race-based objections to peremptory challenges: First, the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; second, the burden of production then shifts to the proponent of the strike to come forward with a race-neutral explanation; third, if a race-neutral explanation is tendered, the trial court must decide whether the opponent of the strike has proved that the proffered race-neutral explanation is merely a pretext for purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, [767–69], 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995); *see also Batson,* 476 U.S. at 91–99, 106 S.Ct. at 1720–1725.
>
> 1. *Prima facie showing.*
>
> To establish a prima facie case, the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23. The trial court must then determine if an examination of all the relevant circumstances raises an inference that the prosecutor excluded venirepersons from the petit jury on account of their race. *Id.* For example, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97, 106 S.Ct. at 1723. The prosecutor's statements may also be a relevant factor. *Id.*

In the present case, the State exercised two of its peremptory challenges to strike black venirepersons (Ms. Velasquez and Ms. Samuels, respectively) from the panel and exercised its remaining six peremptory challenges to strike non-black venirepersons. [Footnote 1: The district court noted that Ms. Velasquez may or may not be black. Because resolving this issue dispositively would not change the conclusion reached herein, we assume *arguendo* that Ms. Velasquez is black.] A third black venireperson, Ms. Brown, was not stricken and remained on the panel. In the selection of alternate jurors, the State exercised its first peremptory challenge to remove the only black venireperson (Ms. Smith) from the alternate panel and waived its second challenge. Presumably the exclusion of three-out-of-four black prospective jurors is sufficient to make out a prima facie *Batson* violation; we need not decide this issue, however, because "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)

    2.  *Race-neutral explanation.*

The next step under the *Batson* analysis is to determine whether the State has presented a race-neutral explanation in support of its exercise of the peremptory challenges against the black venirepersons. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett,* 514 U.S. at [768], 115 S.Ct. at 1771 (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866–67, 114 L.Ed.2d 395 (1991)).

In the present case, the stated explanation for the exclusion of Ms. Samuels was that she currently had a brother serving a sentence for murder in the Louisiana State Prison. The stated explanation for the exclusion of Ms. Smith was that she had a brother who had served an unknown amount of time in the Nevada State Prison for robbery and probation violation, that her mother had been arrested, and that she believed police officers could be rough and rude. The State set forth its reasoning as follows:

> The State has to assume in reading this type of response
> that this person is going to harbor biases against the State;
> or if they don't even feel that they are at the time, they
> certainly might be provoked by certain things that occur in
> the court proceedings, such as a police officer testifying, or
> having to address the sentencing of another individual for a
> violent crime which is something likely to occur in this case.

This court has previously held that "[a]ssociation with the criminal justice system is a facially neutral reason to challenge veniremen." *Clem v. State,* 104 Nev. 351, 355, 760 P.2d 103, 106 (1988), *overruled on other grounds, Zgombic v. State,* 106 Nev. 571, 798 P.2d 548 (1990). Accordingly, we conclude that the State has met its burden in presenting a non-discriminatory basis for striking Ms. Samuels and Ms. Smith. [Footnote 2: The district court declined to order the State to provide an explanation for striking Ms. Velasquez, stating that an explanation of the State's reasons was unnecessary in light of the fact that it was the State's

first peremptory challenge, and no pattern of racial exclusion was evident. We conclude that, after accepting the State's explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the district court to refuse to require an explanation for the exclusion of Ms. Velasquez.]

### 3. *Pretext.*

"[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at [768], 115 S.Ct. at 1771 (citations omitted). If the prosecutor offers explanations that are facially neutral, a defendant may nevertheless show purposeful discrimination by proving the explanations pretextual. *United States v. Joe,* 928 F.2d 99, 102 (4th Cir.1991). "If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Hernandez v. New York,* 500 U.S. at 363, 111 S.Ct. at 1868.

Doyle argues that the State's explanations were pretextual because the State left several non-black venirepersons on the jury who shared the same characteristics as the preempted black venirepersons. Doyle concedes, however, that "[o]f the 27 non African/Americans that were cleared for cause, none of them had a family member that had been in prison." Moreover, the district court's decision in this regard is discretionary and should ordinarily be accorded great deference by the reviewing court. *See Clem,* 104 Nev. at 356, 760 P.2d 103 (citing *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21). Accordingly, we conclude that the district court did not abuse its discretion in rejecting Doyle's challenge on this basis.

Doyle also argues that the State's explanations were pretextual because the criteria of having a family member that has been imprisoned disproportionately excludes blacks. Doyle points to the fact that at least fifty percent of the inmates incarcerated in Clark County are black. [Footnote 3: The district court apparently took judicial notice of this fact, although it rejected the merits of Doyle's argument.] As Doyle argued, unsuccessfully, to the district court: "[T]he fact that [one has] a family member who has been incarcerated in a prison is really a discriminatory criteria, because a much larger percentage of African/American individuals in Clark County, based on the percentage, have family members that are incarcerated in our prison system." Doyle contends that "[a]n offered justification that has a significant disproportionate impact will rarely qualify as a legitimate, race neutral reason ... because disparate impact is itself evidence of discriminatory purpose." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–266, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976).

We believe that Doyle's argument is not consistent with the Supreme Court's equal protection jurisprudence. As recently reiterated by the Supreme Court:

A court addressing this issue must keep in mind the fundamental principle that "official action will not be held unconstitutional solely because it results in a racially

disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights v Metropolitan Housing Development Corp.* 429 U.S. 252, 264–265, 50 L.Ed.2d 450, 97 S.Ct. 555, 563 (1977); see also *Washington v. Davis,* 426 U.S. 229, 239, 48 L.Ed.2d 597, 96 S.Ct. 2040, 2047 (1976).

*Hernandez,* 500 U.S. at 359–360, 111 S.Ct. at 1866. For example, *Washington v. Davis,* cited by Doyle, involved an unsuccessful disproportionate impact challenge to a qualifying test administered to applicants for positions as police officers. The Court held that use of the test did *not* violate the equal protection rights of blacks *even though proportionately more blacks than whites tended to be disqualified by the test* because (1) the fact of disproportionate impact alone did not demonstrate that blacks individually were being denied equal protection of the laws by application of the test and (2) the test was neutral on its face and could rationally be said to serve a purpose that the government was constitutionally empowered to pursue. The Supreme Court explained the distinction between purposeful discrimination and disparate impact as follows:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. *Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.* Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

426 U.S. at 242, 96 S.Ct. at 2049 (citations omitted) (emphasis added).

In short, the Supreme Court upheld the test in *Washington v. Davis,* in spite of its disproportionate impact, because it established a valid and racially neutral qualification for employment. *Id.* at 245, 96 S.Ct. at 2050. Similarly, striking potential jurors who have relatives in the criminal justice system rationally serves the legitimate purpose of assuring a fair and impartial jury in criminal cases. As Doyle has offered no challenge to the legitimacy of this criteria other than that it has a disproportionate impact on blacks, we conclude that Doyle has not met his burden of proving that the State's use of the above-mentioned criteria constitutes *purposeful* racial discrimination.

*Doyle*, 112 Nev. at 887–91; 921 P.2d at 907–10 (emphasis in original).

Regarding prospective jurors Samuels and Smith, the Nevada Supreme Court presumed "the exclusion of three-out-of-four black prospective jurors is sufficient to make out a prima facie *Batson* violation." *See Doyle*, 112 Nev. at 888, 921 P.2d at 907; *see also Shirley v. Yates*, 807 F.3d 1090 (9th Cir. 2015) ("The fact that a prosecutor peremptorily strikes all or most veniremembers of the defendant's race—as was the case here—is often sufficient on its own to make a *prima facie* case at Step One."). The Nevada Supreme Court went on to credit the prosecution's race-neutral explanations for the Samuels and Smith challenges and hold that Doyle did not prove purposeful discrimination regarding those challenges. This Court determines that fairminded jurists could disagree about whether Doyle proved purposeful discrimination as to the Samuels and Smith challenges, and that the Nevada Supreme Court's rulings regarding those challenges were reasonable under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 101.

Regarding the Samuels challenge, the prosecutor stated: "She testified ... that her brother was serving a prison sentence in the state of Louisiana ... and that she didn't know what the sentence was, but she was under the impression he was serving a sentence for first-degree murder." Transcript of Trial, January 4, 1995, Exh. 446, p. II-215 (ECF No. 311-7, p. 219); *see also* Transcript of Trial, January 3, 1995, Exh. 445, pp. I-16–I17, I-24 (ECF No. 311-6, pp. 19–20, 27) (voir dire of Samuels). This was a race-neutral explanation for the challenge of Samuels. *See Hernandez*, 500 U.S. at 360 ("A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

Similarly, regarding the Smith challenge, the prosecutors explained that they struck Smith because she had family members who had contact with the criminal justice system. Transcript of Trial, January 5, 1995, Exh. 447, pp. III-88–III-90 (ECF No. 311-8, pp. 92–94); *see also* Transcript of Trial, January 4, 1995, Exh. 446, pp. II-295–II-305 (ECF No. 311-7, pp. 299–309) (voir dire of Smith). Smith's brother was convicted of

theft-related felonies and served time in a Nevada prison. *See* Transcript of Trial, January 4, 1995, Exh. 446, pp. II-299–II-300, II-303–II-304 (ECF No. 311-7, pp. 303–04, 307–08). Also, Smith's mother was arrested, and, based on how her mother said she was treated, Smith felt police officers could be "rough and rude." *See id.* at II-301–II-305 (ECF No. 311-7, pp. 305–09). These were race-neutral explanations for the challenge of Smith. *See Hernandez*, 500 U.S. at 360.

Doyle argues that the prosecution's reasons for the Samuels and Smith challenges—that they had family members who were arrested and convicted of crimes and served prison sentences—disproportionately includes African-Americans because African-Americans are disproportionately incarcerated. Doyle made this argument to the trial court, and that court appears to have taken judicial notice of disproportionate incarceration of African-Americans in Clark County. *See* Transcript of Trial, January 5, 1995, Exh. 447, pp. III-83–III-88 (ECF No. 311-8, pp. 87–92). However, the disproportionate impact of an asserted reason for a peremptory challenge does not render the reason necessarily purposefully discriminatory; if the asserted reason is facially race-neutral, it satisfies the second step of the *Batson* analysis despite its disparate impact. *See Hernandez*, 500 U.S. at 360.

Moving, then, to the third step of the *Batson* analysis of the Samuels and Smith challenges, Doyle argues, primarily, that other prospective jurors who were not African-American were not struck by the prosecution despite their or their family members' arrests or criminal convictions. The record does show that there were several prospective jurors, not African-American, who had themselves been charged with crimes, or who had family members who had been charged with crimes, and whom the prosecution did not strike with peremptory challenges. *See* Transcript of Trial, January 4, 1995, Exh. 446, pp. II-183–II-193) (ECF No. 311-7, pp. 187–97) (Juror Carabas was convicted of misdemeanor burglary and served nine days in jail, and Carabas' son had been convicted of burglary and theft in Clark County and a fine was imposed, but the prosecution did not strike Carabas, and Carabas served on the jury);

28

*id.* at II-109–II-117) (ECF No. 311-7, pp. 113–21), and Prospective Juror Questionnaires, Exh. 158, Garcia Questionnaire, p. 5 (ECF No. 173-3, p. 54) (Juror Garcia's brother was arrested and charged with a DUI offense, but the prosecution did not ask Garcia about that, and did not strike Garcia, and Garcia served as a juror); Transcript of Trial, January 4, 1995, Exh. 446, pp. II-173–II-183 (ECF No. 311-7, pp. 177–87) (Juror Jackson's son-in-law was arrested for failure to pay traffic tickets, but the prosecution did not ask Jackson about that, and did not strike Jackson, and Jackson served on the jury); *id.* at II-194–II-203) (ECF No. 311-7, pp. 198–207), and Prospective Juror Questionnaires, Exh. 158, Lane Questionnaire, p. 5 (ECF No. 173-3, p. 54) (Juror Lane was arrested and charged with a DUI, and also said she did not like the police in Las Vegas because they harassed her son, but the prosecution did not strike Lane, and Lane served on the jury); *id.* at II-323–II-329 (ECF No. 311-7, pp. 327–33) (Juror Kunich's son was charged with assault with a deadly weapon as a juvenile in Clark County, and was convicted and sentenced to probation, but the prosecution did not ask Kunich any questions at all, and did not strike Kunich, and Kunich served as an alternate juror in the guilt phase of the trial and as a juror in the penalty phase); *id.* at II-228–II-238 (ECF No. 311-7, pp. 232–42) (Juror Harrison was arrested for failing to pay outstanding traffic tickets, but the prosecution did not strike Harrison, and Harrison served on the jury); *id.* at II-310–II-316 (ECF No. 311-7, pp. 314–20) (Juror Werkmeister was convicted of petty larceny in Clark County and paid a fine, but the prosecution did not strike Werkmeister, and Werkmeister served as an alternate juror); *id.* at II-129–II-143 (ECF No. 311-7, pp. 133–147) (Prospective Juror Goodman was charged with trespassing and paid a fine, and the prosecution had an opportunity to strike Goodman and did not, but Goodman ultimately did not serve as a juror); *id.* at II-66–II-85 (ECR No. 311-7, pp. 70–89), and Prospective Juror Questionnaire, Exh. 327, p. 5 (ECF No. 173-3, p. 54) (Prospective Juror Renhard's mother was arrested or charged with a DUI offense, and Renhard had a "very negative" opinion of the police officer involved," and the prosecution had an opportunity to strike Renhard and did not, but Renhard ultimately

did not serve as a juror). However, the crimes of which Samuels' brother and Smith's brother were convicted were more serious than those of the other prospective jurors or their family members, and their sentences were more severe. Furthermore, Samuels did not seem to accept that her brother was guilty. *See* Transcript of Trial, January 3, 1995, Exh. 445, p. I-24 (ECF No. 311-6, p. 27) ("They say he killed someone."). And, the arrest of Smith's mother left Smith with a negative impression of the police. *See* Transcript of Trial, January 4, 1995, Exh. 446, pp. II-301–II-302) (ECF No. 311-7, pp. 304–05). In light of the comparison of Samuels and Smith with the other prospective jurors not challenged by the prosecution, this Court concludes that the Nevada Supreme Court did not unreasonably apply *Batson* in ruling that Doyle did not show the peremptory challenges of Samuels and Smith to be purposefully racially discriminatory.

Turning to the Velasquez challenge, regarding the question whether there was a prima facie showing of a *Batson* violation, the Nevada Supreme Court stated:

> The district court declined to order the State to provide an explanation for striking Ms. Velasquez, stating that an explanation of the State's reasons was unnecessary in light of the fact that it was the State's first peremptory challenge, and no pattern of racial exclusion was evident. We conclude that, after accepting the State's explanation for the exclusion of Ms. Samuels and Ms. Smith, it was not error for the district court to refuse to require an explanation for the exclusion of Ms. Velasquez.

*Doyle*, 112 Nev. at 889 n.2; 921 P.2d at 908 n.2. The Nevada Supreme Court determined that, after the challenges of Samuels and Smith were found to be race-neutral, there remained only one challenge objected to by the defense, the Velasquez challenge, and therefore no pattern, and no prima facie case of a *Batson* violation with respect to the Velasquez challenge.

Doyle does not point to any determination of fact underlying the Nevada Supreme Court's ruling that was unreasonable. *See* Reply (ECF No. 322), pp. 15–21.

Furthermore, Doyle does not show that the Nevada Supreme Court's ruling—that there was no prima facie showing that the Velasquez challenge was discriminatory—was contrary to, or an unreasonable application of, United States Supreme Court precedent. Doyle cites *Snyder v. Louisiana*, 552 U.S. 472 (2008); *Purkett v. Elem*, 514

U.S. 765 (1995); J.*E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994); *Georgia v. McCollum*, 505 U.S. 42 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991); *Hernandez*; and *Batson*, for well-established general principles related to the *Batson* issue. *See* Reply (ECF No. 322), pp. 15–21. However, *Doyle* does not argue that in any of those cases the Supreme Court addressed facts materially indistinguishable from those in this case and reached a different outcome. Nor does Doyle provide any analysis demonstrating that the Nevada Supreme Court's ruling regarding the Velasquez challenge involved an unreasonable application of any governing law established in any of those cases.

The Supreme Court has repeatedly emphasized that, under the AEDPA, a federal court is to afford a heightened level of deference to state court decisions. *See Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Richter*, 562 U.S. at 97–100; *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam). "On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner*, 562 U.S. at 598 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S at 101. Here, reasonable jurists, applying the Supreme Court precedents cited by Doyle, could reasonably argue that, after the Samuels and Smith challenges were determined to be nondiscriminatory, there was no pattern of challenges, or other circumstance, establishing a prima facie showing that the Velasquez challenge was discriminatory, such as to move the analysis to the second step of the *Batson* inquiry.

Turning next to the claim of ineffective assistance of trial counsel in Ground 1—his claim that his trial counsel were ineffective for not adequately objecting on *Batson* grounds to the prosecution's peremptory challenges of African-American prospective jurors—the Court finds that claim to be conclusory, and insubstantial within the meaning

of *Martinez*. *See Martinez*, 566 U.S. at 9. The only shortcoming of trial counsel's performance alleged here by Doyle is that "counsel failed to conduct a thorough comparative juror analysis." *See* Second Amended Petition (ECF No. 265), p. 34. However, the Court finds that counsel's objections were sufficient to allow comparative juror analyses, the judge who ruled on the objections was present for the voir dire of the prospective jurors and had the information necessary to conduct comparative juror analyses, and, as is discussed above, comparative juror analyses do not show the asserted reasons for the Samuels and Smith challenges to be pretextual at any rate. As for the Velasquez challenge, the judge ruled that there was no prima facie case of a *Batson* violation, so the prosecution was not required to provide a race-neutral explanation for that challenge; therefore, the question of pretext, and comparative juror analysis, did not arise with respect to the Velasquez challenge. Doyle does not make a substantial claim that his trial counsel acted unreasonably in this regard, or that any better performance would have given rise to a reasonable probability of a different result. Doyle's counsel in his first state habeas action was not ineffective for failing to assert this claim of ineffective assistance of trial counsel. The claim of ineffective assistance of trial counsel in Ground 1 will be denied as procedurally defaulted.

Doyle has requested an evidentiary hearing with respect to Ground 1. *See* Motion for Evidentiary Hearing (ECF No. 323), pp. 5–7. The Court determines that an evidentiary hearing is unnecessary. Doyle does not indicate what further evidence, not in the record, he would present in support of this claim. Ground 1 can be resolved solely by reference to the record.

Ground 3E

In Ground 3E of his second amended petition, Doyle claims that his trial counsel were ineffective, in violation of his federal constitutional rights, "for failing to prepare Mr. Doyle for his testimony." Second Amended Petition (ECF No. 265), pp. 110–11.

In the May 23, 2018, order, the Court determined that Ground 3E is subject to the procedural default doctrine, but that Doyle might be able to overcome the procedural default under *Martinez*. *See* Order entered May 23, 2018 (ECF No. 301), p. 31.

Doyle argues that his trial counsel's performance was unreasonable because counsel "did not discuss his testimony with him before putting him on the stand." Reply (ECF No. 322), p. 73. As for the prejudice prong of the *Strickland* analysis, Doyle argues that, because he was not properly prepared to testify, "there were a lot of inconsistencies between Doyle's statement to police and his testimony." *Id.* at 74. Doyle points to four such inconsistencies that were mentioned by the prosecution in closing argument. *See id.* Doyle concludes: "If not for these inconsistencies, the jury would have been much more likely to believe Doyle's defense." *Id.*

This claim is subject to denial as procedurally defaulted unless Doyle can show cause and prejudice relative to the procedural default under *Martinez*. *See* Order entered May 23, 2018 (ECF No. 301), p. 31. The Court determines that Doyle does not show cause and prejudice because the claim is insubstantial. Regarding trial counsel's performance, Doyle does not proffer any evidence showing that his counsel did not discuss his testimony with him. Regarding the question of prejudice, the Court finds insubstantial Doyle's contention that the four described inconsistencies between his testimony and his statements to police had such an impact on the outcome of the trial that, absent those inconsistencies, there would have been a reasonable probability of a better outcome. Doyle's counsel in his first state habeas action was not ineffective for not asserting this claim of ineffective assistance of trial counsel. Ground 3E will be denied as procedurally defaulted.

Ground 3G

In Ground 3G, Doyle claims that his trial counsel were ineffective, in violation of his federal constitutional rights, "for failing to move to suppress the evidence recovered as a result of the search warrant." Second Amended Petition (ECF No. 265), pp. 111–18. Doyle contends that the affidavit in support of the warrant for the search of his

residence did not show sufficient probable cause for the search. *See* Reply (ECF No. 322), pp. 22–26.

Doyle also contends in Ground 3G that his trial counsel were ineffective for failing to move suppress his statement to the police, because his arrest for parole violations was a pretext for questioning him, and his statement was involuntary because his will was overborne by the circumstances and because the police used oppressive interrogation tactics. *See id.* at 26–28.

Doyle asserted these claims in his first state habeas action. *See* Memorandum of Points and Authorities in Support of Petition for Post-Conviction Relief, Exh. 177, pp. 9–19 (ECF No. 174, pp. 51–61). The state district court held an evidentiary hearing (*see* Transcript of Evidentiary Hearing, Respondents' Exh. 3 (ECF Nos. 209-4, 209-5)) and denied Doyle's petition. *See* Findings of Fact, Conclusions of Law and Order, Exh. 181 (ECF No. 74, pp. 94–98). Doyle appealed and asserted these claims on the appeal. *See* Appellant's Opening Brief, Exh. 182, pp. 15–19, 25–30 (ECF No. 174-2, pp. 17–21, 27–32). The Nevada Supreme Court ruled as follows regarding the claim that Doyle's trial counsel was ineffective for failing to move to suppress evidence obtained as a result of the search of Doyle's residence:

> II. *Failure to challenge the admissibility of the fruits of a search of Doyle's home on the basis that the search warrant was not based on probable cause.*
>
> Doyle argues that the district court erred in concluding that trial counsel were not ineffective for failing to seek suppression of a pair of denim pants and a pair of shoes which were recovered during a search of Doyle's residence pursuant to a search warrant. The shoes were used by the State to tie Doyle to the crime scene and injuries to Mason's body. Doyle contends that a motion to suppress this evidence would have been meritorious because the search warrant allowing for its seizure was not supported by probable cause. Doyle attacks the affidavit underlying the search warrant on grounds that the affidavit (1) was based on information furnished by an unreliable informant and insufficiently corroborated; (2) failed to show a nexus between the place to be searched, Doyle's residence, and the items to be seized therefrom; and (3) omitted information and was misleading. We disagree.
>
> Whether probable cause is present to support a search warrant is determined by a totality of circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Keesee v. State,* 110 Nev.

997, 1002, 879 P.2d 63, 67 (1994). A deficiency in either an informant's veracity and reliability or his basis of knowledge "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates,* 462 U.S. at 233, 103 S.Ct. 2317. Further, the issuing judge's determination of probable cause should be given great deference by a reviewing court. *Id.* at 236, 103 S.Ct. 2317. "'A grudging or negative attitude by reviewing courts toward warrants,' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; 'courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.'" *Id.* (alterations in original) (internal citation omitted) (quoting *United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). The duty of a reviewing court is simply to determine whether there is a substantial basis for concluding that probable cause existed. *Id.* at 238–39, 103 S.Ct. 2317; *Keesee,* 110 Nev. at 1002, 879 P.2d at 67.

We conclude that the affidavit here demonstrates a substantial basis for concluding that probable cause existed. The veracity of the informant may have been questionable based on the fact that he was incarcerated at the time of his tip to police. However, the information furnished by him was corroborated by details from the crime scene not released to the public, further investigation by police, and statements from two other witnesses. Therefore, we conclude that any deficiency in his reliability was adequately compensated.

We reject Doyle's contention that the affidavit failed to demonstrate an adequate nexus between his residence and the items to be seized therefrom. Probable cause requires a showing of "trustworthy facts and circumstances which would cause a person of reasonable caution to believe that it is more likely than not that the specific items to be searched for are: seizable and will be found in the place to be searched." *Keesee,* 110 Nev. at 1002, 879 P.2d at 66. Our review of the facts set forth in the affidavit shows probable cause to believe that items used in the crime and sought to be seized would be found at Doyle's residence.

Moreover, Doyle has failed to show that any information omitted from the affidavit or stated in an allegedly "misleading" manner would have undermined the probable cause determination. A defendant is not entitled to suppression of the fruits of a search warrant, even based on intentional falsehoods or omissions, unless probable cause is lacking once the false information is purged and any omitted information is considered. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (addressing falsehoods); *United States v. Cronan,* 937 F.2d 163, 165 (5th Cir. 1991) (addressing omissions); *see also Point v. State,* 102 Nev. 143, 150, 717 P.2d 38, 43 (1986), *disapproved of on other grounds by Stowe v. State,* 109 Nev. 743, 857 P.2d 15 (1993). Here, considering the omitted information and purging the information claimed to be misleading, we conclude that the affidavit sufficiently demonstrates probable cause.

A motion to suppress evidence seized from Doyle's residence on the grounds of an invalid search warrant would not have been meritorious. Thus, Doyle has failed to demonstrate prejudice to support his claim of ineffective counsel.

*Doyle*, 116 Nev. at 158–59, 995 P.2d at 471–72.

Doyle argues that this ruling by the Nevada Supreme Court is contrary to clearly established federal law, under 28 U.S.C. § 2254(d), because the Nevada Supreme Court granted deference to the state court that issued the search warrant. *See* Reply (ECF No. 322), pp. 22–23. Doyle argues this was contrary to the holding of *Ornelas v. United States*, 517 U.S. 690 (1996). In *Ornelas*, the Supreme Court ruled that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Id.* at 699. *Ornelas*, though, was an appeal from a judgment of conviction in federal court, and there is no indication that the *Ornelas* Court was of the view that de novo review of probable cause determinations is mandated by the federal constitution, or that its holding would be binding on state courts. The Nevada Supreme Court's ruling—affording deference to the lower court that issued the search warrant—was not contrary to *Ornelas*.

Doyle argues, further, that the Nevada Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence presented. Affording the state court ruling the deference prescribed by 28 U.S.C. § 2254(d), this Court determines that this argument is without merit. *See* Application and Affidavit for Search Warrant, Exh. 222 (ECF No. 174-7, pp. 5–21).

Regarding the claim that Doyle's trial counsel were ineffective for failing to move to suppress Doyle's statement to the police, the Nevada Supreme Court ruled as follows:

> I. *Failure to challenge the admissibility of Doyle's statement to police as tainted by a pretextual arrest.*
>
> Doyle contends that the district court applied the wrong standard in determining that Doyle's trial counsel were not ineffective for failing to seek suppression of Doyle's post-arrest, post-*Miranda* statement to police. Doyle argues that the district court should have applied the standard first adopted in *Alejandre v. State*, 111 Nev. 1235, 1239–40, 903 P.2d 794, 796 (1995), *reaffirmed in Taylor v. State*, 111 Nev. 1253, 1255–57, 903 P.2d 805, 807–08 (1995), and *subsequently abandoned in Gama v. State*, 112 Nev. 833, 836–37, 920 P.2d 1010, 1012–13 (1996) (overruling *Alejandre* and *Taylor*), to determine whether Doyle's statement to police was tainted by an impermissibly pretextual arrest made by Doyle's parole

officer. Doyle contends that under *Alejandre*'s test, a motion to suppress his statement would have been meritorious, and thus, trial counsel were ineffective for failing to make such a motion. We conclude that this contention lacks merit.

When an ineffective assistance of counsel claim is based upon counsel's failure to file a motion to suppress a confession or a motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, "the prejudice prong must be established by a showing that the claim was meritorious and that there was a reasonable likelihood that the exclusion of the evidence would have changed the result of a trial." [*Kirksey v. State,* 112 Nev. 980, 990, 923 P.2d 1102, 1109 (1996).]

In *Alejandre,* we recognized that two competing tests had emerged to determine whether a stop by police which is alleged to be pretextual violates the Fourth Amendment: (1) the "would" test, under which a stop is impermissibly pretextual unless a reasonable officer would have made the stop absent the invalid purpose, and (2) the "could" test, under which a stop is valid so long as the officer was legally authorized to make the stop, even if the officer would have ignored the underlying valid justification for the stop but for his other suspicions. We then adopted the "would" test, concluding that it was supported by persuasive reasoning. *Alejandre*, 111 Nev. at 1239–40, 903 P.2d at 796; *see also Taylor*, 111 Nev. at 1257, 903 P.2d at 807–08.

In *Gama,* this court recognized that the "would" test as applicable to claims of pretext was discredited by the Supreme Court's ruling in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *Gama*, 112 Nev. at 836, 920 P.2d at 1012–13. In *Whren*, the Court held that the temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective. *Whren,* 517 U.S. at 808–19, 116 S.Ct. 1769. In so doing, the Court recognized that subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis. *Id.* at 813, 116 S.Ct. 1769. [Footnote 1: Doyle does not argue that his arrest is invalid under *Gama* or that the "could" test announced in *Whren* and adopted in *Gama* does not apply to arrests made by parole officers pursuant to NRS 176A.500. Moreover, we note that although *Whren* involved a traffic detention, its conclusion that subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis is equally applicable to arrests. *See United States v. Sayetsitty*, 107 F.3d 1405, 1414 (9th Cir. 1997); *United States v. Hathcock*, 103 F.3d 715, 719 (8th Cir. 1997).] Based on *Whren*'s holding, this court in *Gama* stated that it was constrained to overrule *Alejandre* and *Taylor* to the extent that each required application of the "would" test to pretext claims under the Fourth Amendment and the Nevada Constitution, article 1, section 18 (protecting against unreasonable seizures and searches). *Gama,* 112 Nev. at 836, 920 P.2d at 1013. We then determined that the "could" test was the proper test to apply where a claim of pretext is made. *Id.* at 836–37, 920 P.2d at 1013.

Doyle argues that *Alejandre* was the controlling law at the time of his arrest and that *Gama* applies prospectively only. Doyle acknowledges

that *Alejandre* was not decided until October 4, 1995, which was after Doyle's January 1995 trial. Nevertheless, he argues that the *Alejandre* "would" test "did not materialize out of thin air," as this court had previously recognized a "would" test in *Hatley v. State,* 100 Nev. 214, 678 P.2d 1160 (1984), and this test was already recognized in other jurisdictions as indicated in *Alejandre.* Therefore, he contends that trial counsel should have recognized the existence of legally-cognizable grounds to support a motion to suppress. Further, Doyle argues that if the issue had been preserved, appellate counsel could have raised it after *Alejandre* was decided.

We conclude that Doyle is mistaken in his contention that *Alejandre* merely restated the law as it was declared in *Hatley.* In *Hatley,* the appellant claimed in a post-conviction petition that he had been illegally arrested at his home without a warrant. 100 Nev. at 215, 678 P.2d at 1161. The State opposed the petition by attaching a sworn affidavit stating that the appellant was arrested on a bench warrant for failure to appear for a traffic violation. The affidavit contradicted trial testimony. The district court denied the petition without an evidentiary hearing. This court concluded that an evidentiary hearing was necessary to resolve the conflict. *Id.* at 216–17, 678 P.2d at 1161–62. We then stated:

> Additionally, we note that an evidentiary hearing was necessary to determine the truth of appellant's alternate contention that even if the arresting officers were aware of the existence of the misdemeanor bench warrant at the time of appellant's arrest, they were nevertheless using it as an impermissible "pretext" to arrest appellant on the burglary charge. This contention, if true, would at least *arguably* entitle appellant to relief.

*Id.* at 217, 678 P.2d at 1162 (emphasis added). Contrary to Doyle's suggestion, the above quoted language in *Hatley* was "inconclusive dictum," which merely alluded to the pretext issue, but did not express this court's recognition of the "would" test as the proper test for pretext issues. *Taylor,* 111 Nev. at 1260, 1262, 903 P.2d at 809–10, 811 (Steffen, C.J., concurring in result). The "would" test was not squarely addressed or embraced by this court until *Alejandre* was decided. The failure of counsel to anticipate a change in the law does not constitute ineffective assistance. *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir. 1999); *see also Leonard v. State,*114 Nev. 639, 659–60, 958 P.2d 1220, 1235 (1998), *cert. denied,* 525 U.S. 1154, 119 S.Ct. 1059, 143 L.Ed.2d 64 (1999). This is true even where, as here, the theory upon which the court's later decision is based is available, although the court had not yet decided the issue. *See Ruff v. Armontrout,* 77 F.3d 265, 268 (8th Cir.1996).

Likewise flawed is Doyle's reasoning that because *Alejandre* was decided while Doyle's appeal was pending, he would have been entitled to application of *Alejandre*'s test had counsel preserved the issue for appeal. In *Gama,* which we decided on July 22, 1996, we adopted a new rule for determination of claims of pretext. "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final" at the time the decision announcing the rule is rendered. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Under *Griffith,* "any new rule applies retroactively to all cases pending on direct review or not yet final ...

[and] [t]his is quite obviously equally true of [a] new ruling narrowing Fourth Amendment rights." 5 Wayne R. LaFave, Search and Seizure § 11.5(d), at 358 (3d ed. 1996). *See also State v. Thomas*, 714 So.2d 1176, 1177 (Fla.Dist.Ct.App. 1998) (applying *Whren* retroactively). A case is "final" when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith*, 479 U.S. at 321 n. 6, 107 S.Ct. 708. This court rendered its decision in Doyle's direct appeal on July 22, 1996, the same date we decided *Gama*, and Doyle subsequently petitioned for rehearing. This court denied Doyle's petition for rehearing on June 23, 1997. Clearly Doyle's case had not become final prior to this court's ruling in *Gama*, and therefore *Gama*'s "could" test would apply to any pretext claim made by Doyle.

Furthermore, we conclude that Doyle has not demonstrated that his arrest was invalid even under *Alejandre's* "would" test. His assertion of pretext is speculative at best. Doyle put forth no evidence of the circumstances leading to the parole officer's decision to arrest other than evidence showing that Doyle had not been arrested for prior repeated violations of his parole conditions. The fact that Doyle's parole officer did not arrest Doyle until after giving him numerous warnings for parole violations over the course of four months does not establish that he would have been permitted to remain free indefinitely absent police officers' intent to question him regarding Mason's murder. Thus, Doyle has not demonstrated that a reasonable parole officer would not have arrested him for repeatedly violating the conditions of his parole absent the police officers' intent to question him for the murder.

Accordingly, Doyle has failed to show that a motion to suppress based upon *Alejandre's* "would" test would have been meritorious. Therefore, we conclude that Doyle was not prejudiced by his counsel's failure to challenge admission of his statement to police.

*Doyle*, 116 Nev. at 154–57, 995 P.2d at 469–71. Doyle does not show the Nevada Supreme Court's ruling, denying him relief on his claim under the federal constitution, to be contrary to, or an unreasonable application of, United States Supreme Court precedent, or to be based on an unreasonable determination of the facts in light of the evidence.

The Fourth Amendment provides that the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. "[T]he touchstone of the Fourth Amendment is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001). Fourth Amendment reasonableness "is predominantly an objective inquiry," which generally questions whether "the circumstances, viewed objectively, justify the challenged action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011) (internal quotation

marks, citations and brackets omitted). If so, that action was reasonable "*whatever* the subjective intent" that motivated the relevant officials. *Whren v. United States*, 517 U.S. 806, 814 (1996) (emphasis in original). The officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 812–13.

Doyle asserts that his arrest was pretextual, that absent the officer's intent to question Doyle he would not have been arrested, and that, therefore, trial counsel should have moved to suppress his statement to the police. *See* Second Amended Petition (ECF No. 265), pp. 116–17; Reply (ECF No. 322), pp. 26–27. But this argument simply disregards the rule of *Whren*; the police officer's subjective intention does not matter. Doyle makes no argument that *Whren* is inapplicable. And, Doyle does not argue that, applying the objective "could" test applicable under *Whren*, his arrest was improper. In fact, in the Nevada Supreme Court, Doyle apparently conceded that his arrest was valid if the *Whren* test—adopted in Nevada in *Gama v. State*, 112 Nev. 833, 920 P.2d 1010 (1996)—is applied. *See Doyle*, 116 Nev. at 155 n.1 ("Doyle does not argue that his arrest is invalid under *Gama*...."). The Nevada Supreme Court's ruling in this regard was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence.

Moreover, this Court determines that Doyle does not show his waiver of his *Miranda* rights to have been involuntary. The Court finds this part of Doyle's claim to be wholly without merit.

Doyle's trial counsel were not ineffective for not moving to suppress Doyle's statement to the police, and Doyle was not prejudiced.

The Court will deny Doyle habeas corpus relief on Ground 3G.

Ground 3H

In Ground 3H, Doyle claims that his trial counsel were ineffective, in violation of his federal constitutional rights, "for failing to object to the introduction of a pair of stained pants without any explanatory testimony." Second Amended Petition (ECF No.

265), pp. 118–20. Doyle claims that the pair of pants, found in Doyle's residence, was

irrelevant and inadmissible as evidence because "[t]here was no testimony regarding

whom these pants belonged to, what type of stain was on them or whether they were

worn during the offense." *Id.* at 118.

Doyle asserted this claim in his first state habeas action. *See* Memorandum of

Points and Authorities in Support of Petition for Post-Conviction Relief, Exh. 177, pp.

19–21 (ECF No. 174, pp. 61–63). The state district court held an evidentiary hearing

(*see* Transcript of Evidentiary Hearing, Respondents' Exh. 3 (ECF Nos. 209-4, 209-5))

and denied Doyle's petition. *See* Findings of Fact, Conclusions of Law and Order, Exh.

181 (ECF No. 74, pp. 94–98). Doyle appealed, and asserted this claim on the appeal.

*See* Appellant's Opening Brief, Exh. 182, pp. 22–25 (ECF No. 174-2, pp. 24–27). The

Nevada Supreme Court ruled as follows:

> *III. Failure to object to admission into evidence of stained pants.*
>
> Doyle claims that the district court erred in concluding that trial
> counsel were not ineffective for failing to object to admission into evidence
> of the denim pants recovered during a search of the bedroom closet in
> Doyle's residence. Doyle specifically argues that the pants were not
> relevant evidence and their admission into evidence prejudiced him
> because the pants were stained with some unidentified substance, which
> the jury might have inferred was Mason's blood. We conclude that the
> district court did not err.
>
> Even assuming that the state failed to demonstrate the relevance of
> this evidence, Doyle has not shown that he was prejudiced by its
> admission at trial. The other evidence adduced in support of Doyle's guilt
> was strong. Additionally, Doyle does not dispute the court's findings that
> the pants were introduced in a perfunctory manner without comment or
> further reference. We further note that the officer through whose testimony
> the pants were introduced testified only that the pants were seized "out of
> an abundance of caution." No testimony or argument suggested that the
> stain was blood. In light of the foregoing facts, we conclude that Doyle has
> failed to demonstrate that, but for deficient performance of counsel, the
> result of trial would probably have been different.

*Doyle*, 116 Nev. at 159–60, 995 P.2d at 472. This Court finds the Nevada Supreme

Court's ruling to be reasonable.

At trial, the pants were admitted into evidence, with little fanfare, as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE WITNESS:  It's a pair of denim pants, has my initials on them, which are the pair of pants that I impounded on that day. They had some sort of stain on them that I observed that I wanted checked.

MR. OWENS [prosecutor]:  You just took it out of an abundance of caution?

THE WITNESS:  Yes.

\*     \*     \*

Q.     Detective Ziola, where were the jeans located?

A.     In the closet with the shoes.

Transcript of Trial, January 10, 1995, Exh. 450, pp. VI-29–VI-30 (ECF No. 311-11, pp. 33–34). This Court agrees that the admission of the pants into evidence did not prejudice Doyle, as they were introduced in a perfunctory manner, without comment or further reference. There was no further testimony about the pants, and the prosecution did not mention them in closing arguments. Moreover, this Court agrees that there was strong evidence of Doyle's guilt aside from any inference that could possibly have been drawn regarding the pants.

This ruling by the Nevada Supreme Court was not contrary to, or an unreasonable application of, *Strickland* or any other United States Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented. The Court will deny Doyle habeas corpus relief on Ground 3H.

Ground 3I

In Ground 3I, Doyle claims that his trial counsel were ineffective, in violation of his federal constitutional rights, "for failing to object to prejudicial and multiple enlarged photographs of the victim."  Second Amended Petition (ECF No. 265), pp. 120–21.

Doyle asserted this claim in his first state habeas action. *See* Memorandum of Points and Authorities in Support of Petition for Post-Conviction Relief, Exh. 177, pp. 21–22 (ECF No. 174, pp. 63–64). The state district court held an evidentiary hearing (*see* Transcript of Evidentiary Hearing, Respondents' Exh. 3 (ECF Nos. 209-4, 209-5)) and denied Doyle's petition. *See* Findings of Fact, Conclusions of Law and Order, Exh. 181 (ECF No. 74, pp. 94–98). Doyle appealed, and asserted this claim on the appeal.

42

*See* Appellant's Opening Brief, Exh. 182, pp. 19–22 (ECF No. 174-2, pp. 21–24). The

Nevada Supreme Court ruled as follows:

> *IV. Failure to object to admission into evidence and projection display of multiple autopsy photographs.*
>
> Doyle contends that the district court erred in concluding that trial counsel were not ineffective for failing to object to the admission and projection display of color autopsy photographs depicting injuries to Mason's body. Doyle argues that the photographs were cumulative and gruesome, were inadmissible because the cause of death was not disputed, and should not have been displayed to the jury through a projection system. We conclude that Doyle's contentions lack merit.
>
> Doyle has not shown that any of the photographs were duplicative, and we conclude that all were relevant to the cause of death and manner of injury. Most of the photographs depicted patterns on Mason's body consistent with footwear impressions and were additionally relevant to show the relationship between Mason's injuries and the soles of shoes found in Doyle's possession. Trial counsel relied on some of these photographs to support Doyle's defense of mere presence. Therefore, it is apparent that defense counsel made a strategic decision not to object to these photographs. Counsel's strategy decisions are not subject to challenge absent extraordinary circumstances. *Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280–81 (1996). Two of the photographs depict injuries to Mason's head and face, and are gruesome. However, even gruesome photographs are admissible if they aid in ascertaining the truth, such as when used to show the cause of death, the severity of wounds and the manner of injury. *Browne v. State*, 113 Nev. 305, 314, 933 P.2d 187, 192 (1997); *Domingues v. State*, 112 Nev. 683, 695, 917 P.2d 1364, 1373 (1996).
>
> Doyle's argument that the autopsy photographs could not be utilized to show the cause of death where he did not dispute it is without merit. By pleading not guilty, a defendant puts all elements of the offense at issue. *Sonner v. State*, 112 Nev. 1328, 1338–39, 930 P.2d 707, 714 (1996), *modified in part on other grounds on rehearing*, 114 Nev. 321, 955 P.2d 673, *cert. denied*, 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998). Therefore, in the wake of Doyle's not guilty plea, the photographs were admissible to prove the State's case with essential facts relating to Mason's murder.
>
> We similarly reject Doyle's contention related to the display of the photographs. Here, the photographs were briefly projected onto a screen to aid the medical examiner in explaining his findings related to the cause of death and the manner of injury to the jury. While this court has not addressed the display of autopsy photographs through projection systems, we note that other state courts have approved of this method of facilitating the testimony of a medical examiner. *See*, *e.g.*, *People v. Harris*, 633 P.2d 1095, 1098 (Colo.Ct.App.1981) (no error in permitting autopsy photographs to be displayed to jury via projected color slides); *Keperling v. State*, 699 A.2d 317, 319 (Del.1997) (where photographic slides are admissible evidence, allowing their projection before jury does not constitute error); *Ottis v. State*, 269 Ga. 151, 496 S.E.2d 264, 269 (1998)

(projection method of presenting photographs of murder victim is permissible absent distortion or disproportion of what is depicted). This court has previously approved of the use of enlargements for such purposes. *See Thomas v. State*, 114 Nev. 1127, 1141, 967 P.2d 1111, 1120–21 (1998) (enlarged diagram of murder victim's body), *cert. denied*, 528 U.S. 830, 120 S.Ct. 85, 145 L.Ed.2d 72 (1999); *see also Lloyd v. State*, 94 Nev. 167, 169, 576 P.2d 740, 742 (1978) (enlarged photograph depicting injuries to rape victim). Additionally, we have long recognized the generally sanctioned rule that images properly admissible as photographs "may be projected to illustrate the testimony of witnesses." *State v. Kuhl*, 42 Nev. 185, 204, 175 P. 190, 196 (1918). We are thus persuaded that where autopsy photographs are admissible, it is permissible to project the same images onto a screen as a means of assisting a medical examiner in explaining his or her findings relevant to the issues before a jury. Moreover, we conclude that under the circumstances present here no error resulted from the projection display of autopsy photographs.

The district court would have been within its discretion in overruling any objection to the admission and projection display of the autopsy photographs. Therefore, we fail to perceive any prejudice to Doyle to warrant relief on his claim of ineffective counsel.

*Doyle*, 116 Nev. at 160–62, 995 P.2d at 472–73. The Court finds the Nevada Supreme Court's ruling to be reasonable.

Doyle contends that his trial counsel should have objected to admission of the photographs into evidence on state evidentiary law grounds, specifically NRS § 48.035. *See* Second Amended Petition (ECF No. 265), pp. 120–21. Doyle contends that "[t]hese photographs were cumulative and their prejudice exceeded any probative value." *See id.* The Nevada Supreme Court's ruling to the contrary—that the photographs were not inadmissible on those grounds—was based on state law, and, as such, is authoritative and beyond the scope of this federal habeas action. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[S]tate court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

In light of the Nevada Supreme Court's ruling on the state-law evidentiary question underlying Ground 3I, the ineffective assistance of counsel claim in Ground 3I fails. Doyle's trial counsel was not ineffective for not making meritless objections, and Doyle was not prejudiced. The ruling of the Nevada Supreme Court, denying relief on

the claim in Ground 3I, was not contrary to, or an unreasonable application of, *Strickland* or any other United States Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented. The Court will deny Doyle habeas corpus relief on Ground 3I.

Ground 3J

In Ground 3J, Doyle claims that his trial counsel were ineffective, in violation of his federal constitutional rights, for failing "to present evidence impeaching Michael Smith's testimony." Second Amended Petition (ECF No. 265), pp. 121–23.

In the May 23, 2018, order, the Court determined that Ground 3J is subject to the procedural default doctrine, but that Doyle might be able to overcome the procedural default under *Martinez*. *See* Order entered May 23, 2018 (ECF No. 301), pp. 34–35. The Court determines, however, that Ground 3J is insubstantial, and, therefore, Doyle does not overcome the procedural default.

The following exchange occurred during Smith's testimony:

> Q.  Okay. Let me direct your attention to the middle of January 1994. Do you recall being in the Defendant's apartment while the two of you and perhaps other people were watching a movie?
>
> A.  Yes.
>
> Q.  And what if anything did the Defendant say while you were watching this movie?
>
> A.  That people don't die that easy.
>
> Q.  Did you ask him to explain at that time what he meant by saying, "People don't die that easy"?
>
> A.  No.
>
> *   *   *
>
> Q.  Now, I was directing your attention to the middle of January 1994. Do you recall watching a movie in the Defendant's apartment with some other people perhaps?
>
> A.  Yes.
>
> Q.  And do you recall the Defendant saying anything to you while you were watching that movie?

A.  Yes.

Q.  What did he say to you?

A.  "People don't die that easily."

Transcript of Trial, January 6, 1995, Exh. 448, pp. IV-165–IV-167 (ECF No. 311-9, pp. 171–73). Doyle claims that his counsel was ineffective for not impeaching this testimony.

Doyle has filed a September 23, 2016, declaration of Brett Graves, who was a friend of Smith. *See* Declaration of Brett Graves, Exh. 335 (ECF No. 267-16). Graves states the following in his declaration:

> I was living in the same apartment complex as Tony [Doyle] and his girlfriend Vaedra Roseman during the time of his arrest. In fact, our apartments were located directly across a small walkway from one another and we could see into each other's living rooms from our windows. I also visited their apartment on many occasions. There weren't any televisions in Tony and Vaedra's apartment throughout the time that Tony lived there. Their home was pretty empty overall, with few pieces of furniture and appliances.

*Id.* at 1 (ECF No. 267-16, p. 2) (paragraph numbering omitted). Doyle argues that, had his trial counsel conducted a sufficient investigation, they would have spoken with Graves and learned this information, and they could have used it to impeach Smith's testimony. *See* Second Amended Petition (ECF No. 265), p. 122.

Graves also states in his declaration:

> Mike [Smith] started selling drugs when he became older, but he was always more of a weak punk kid than a street thug. Mike was often released shortly after being arrested, even while his codefendants remained in police custody. As time went on, Mike developed the reputation of being a police informant. He used to tell me that he was not cut out for going to prison, and had no intention of going there. I often responded by telling him to get out of the drug game and he'd have nothing to worry about.
>
> I personally witnessed Mike Smith get arrested at some point within days of Tony's arrest on his instant case. Mike told me about this arrest and confirmed he had a criminal case that was simultaneously going on with Tony's death penalty case investigation. Given Mike's history of informing to get out of trouble, it would not surprise me if he was given a deal by prosecutors in exchange for his testimony against Tony.

Declaration of Brett Graves, Exh. 335, p. 1 (ECF No. 267-16, p. 2) (paragraph numbering omitted). Doyle argues that his trial counsel should have discovered this information as well, and that his trial counsel could have used it to impeach Smith's testimony. *See* Second Amended Petition (ECF No. 265), pp. 122–23.

This Court determines that, considering all the evidence at trial, the strength of the evidence of Doyle's guilt, and the impeachment of Smith that Doyle's trial counsel did accomplish, the additional impeachment of Smith that might have been possible with this information from Graves would have been minimal and would not have given rise to a reasonable probability of a different outcome at trial. *See* Transcript of Trial, January 6, 1995, Exh. 448, pp. IV-178–IV-191, IV-193 (ECF No. 311-9, pp. 184–97, 199) (cross-examination of Smith); Transcript of Trial, January 10, 1995, Exh. 450, pp. VI-2–VI-12 (ECF No. 311-11, pp. 6–16) (Police Officer Joseph Arthur Maviglia testified that Smith was under arrest when he questioned him, and that possible felony drug charges against Smith were not pursued.).

The Court finds this claim of ineffective assistance of trial counsel to be insubstantial, and that Doyle's counsel in his first state habeas action was not ineffective for not asserting this claim, and Doyle, therefore, does not overcome the procedural default under *Martinez*. Ground 3J will be denied as procedurally defaulted.

Ground 6A8

In Ground 6A8, Doyle claims that his federal constitutional rights were violated as a result of prosecutorial misconduct because "[t]he prosecutor misrepresented the testimony of Gary and Maria Mason." Second Amended Petition (ECF No. 265), pp. 145–47. However, despite that description of the claim in the title of Ground 6A8 (*see id.* at 145), the actual substance of the claim is that the prosecution elicited false testimony from Gary and Maria Mason. *See id.* at 147 ("By eliciting the false or misleading testimony from Gary and Maria, the prosecutor improperly manipulated the victim-impact testimony to evoke the sympathy of the jury."). Ground 6A8 also includes a claim of ineffective assistance of trial counsel. *See id.*

In the May 23, 2018, order, the Court dismissed all of Ground 6A8 except the claim of ineffective assistance of trial counsel; the Court determined that the claim of ineffective assistance of trial counsel in Ground 6A8 is subject to the procedural default doctrine, but that Doyle might be able to overcome the procedural default under *Martinez*. *See* Order entered May 23, 2018 (ECF No. 301), pp. 46–48.

Doyle's claim concerns the following testimony by Ebony Mason's father, Gary Mason, which he gave in response to questions the prosecutor asked about the effect of Ebony's death on her sister:

> Q.  Anyone else in the family? Is there a sister?
>
> A.  Well, my daughter, Melano—she's in the black jacket.
>
> Q.  That would be the victim's sister?
>
> A.  Yes. Same thing with her. She's got every newspaper clipping, every photograph that she could come up with. There is an entire shrine dedicated to Ebony. They were very close.
>
> There is countless friends that—we've actually had one friend move into the house. It's affected an entire city as far as that goes. There's—you know, everyone that I work with knows—knew her very well. They raised her from the time she was born.
>
> She was—this whole thing with this guy and the neighborhood—this was one month out of Ebony's life. I mean, this was just a few—the rest of her life she was quiet. She didn't—you know, she—I've seen different articles painting Ebony as being this and that. And she's—she was bad, she was having sex and she was doing this.
>
> But when it all came down, I knew Ebony. She was—she was into a situation as a direct result of a major depression. You know, she was actually mentally ill at the time that all this stuff was taking place, from a prior tragedy in her life.
>
> Ebony was a nice girl. She was a local girl. She was raised here. She was born here. And she wasn't a troublemaker. She was a good girl. And this was not fair for this to happen. It's affected lots of people, quite a few people.

Transcript of Trial, February 6, 1995, Exh. 459, pp. IX-11–IX-12 (ECF No. 311-20, pp. 15–16). Doyle claims that this testimony was false. In support of his claim, Doyle proffers evidence that he contends shows that Ebony was a "heavy pot smoker" more than twenty months before her murder and that she was arrested for possession of a

sawed off shotgun and her children were released into Gary Mason's custody. *See* Second Amended Petition (ECF No. 265), pp. 145–46 (citing Family Court Records, Exh. 282 (ECF Nos. 175-6, 175-7)).

Doyle's claim also concerns testimony of Maria Mason, Ebony's mother. Maria Mason testified that after Ebony's death, she received custody of Ebony's children. *See* Transcript of Trial, February 6, 1995, Exh. 459, pp. IX-24–IX-25 (ECF No. 311-20, pp. 28–29). She testified: "I never knew that I would have to raise my grandkids." *Id.* at 24 (ECF No. 311-20, p. 28). Doyle claims this testimony was false, because on cross-examination Maria stated that she had custody of Ebony's children previously, after Ebony's baby died and before Ebony was killed. *See* Second Amended Petition (ECF No. 265), p. 146; *see also* Transcript of Trial, February 6, 1995, Exh. 459, p. IX-30 (ECF No. 311-20, p. 34). Doyle also claims that Maria testified falsely that Ebony was "never taken away" and was "never placed in a home." *See* Transcript of Trial, February 6, 1995, Exh. 459, p. IX-35 (ECF No. 311-20, p. 39). Doyle proffers evidence that he contends shows that at some time Ebony and her brother were removed from Maria's home and went to live with an aunt. *See* Second Amended Petition (ECF No. 265), p. 147 (citing Family Court Records, Exh. 282 (ECF Nos. 175-6, 175-7)).

Doyle argues that the prosecution committed misconduct by eliciting such allegedly false testimony from Gary and Maria Mason, and that "[t]rial counsel's failure to object, or properly preserve this claim ... violated [his] constitutional rights to the effective assistance of counsel." *Id.* This Court finds Doyle's claim to be meritless, and insubstantial within the meaning of *Martinez*.

The knowing use of false evidence by the state, or the failure to correct false evidence, may violate due process. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). To establish a *Napue* claim, a petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) ... the false testimony was material." *United States v. Zuno–Arce,* 339 F.3d 886, 889 (9th Cir. 2003) (citing *Napue,* 360 U.S. at 269–71).

Putting aside the question whether it was unreasonable as a strategic matter for defense counsel to refrain from objecting to this sort of testimony from the bereaved parents of the murder victim, it is clear that the prosecution did not knowingly elicit testimony from Gary and Maria Mason that could be considered false. Gary's testimony that Ebony was a good girl and not a troublemaker, and that her mental health and behavior were affected by the death of her child, were subjective opinions; Doyle does not show that testimony to be false and does not show that the prosecution knowingly elicited false testimony. That is the case, as well, regarding Maria Mason's testimony that she never knew that she would have to raise her grandchildren; that, too, was an expression of subjective opinion, and Doyle does not show it to be false and does not show that the prosecution knowing elicited false testimony. As for Maria's testimony that Ebony was never taken from her and never placed in a home, that testimony was not elicited by the prosecution at all; it was elicited by the defense on cross-examination. In short, Doyle does not show that any objection to the testimony of Gary and Maria Mason, or any other action to preserve this prosecutorial misconduct claim, would have been availing or would have given rise to a reasonable probability of a better outcome for him in the penalty phase of his trial.

The claims in Ground 6A8 are insubstantial. Doyle's counsel in his first state habeas action was not ineffective for failing to assert these claims. Therefore, Doyle does not overcome the procedural default under *Martinez*. The claims in Ground 6A8 will be denied as procedurally defaulted.

Ground 9A1

In Ground 9A1 of his second amended petition, Doyle claims that his federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court failed to properly instruct the jury as to the elements of first-degree premeditated and deliberate murder." Second Amended Petition (ECF No. 265), pp. 188–94. Here, Doyle places at issue the so-called "*Kazalyn* instruction," a jury instruction approved by the Nevada Supreme Court in

*Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992), and *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992), and disapproved by the same court eight years later in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000).

The jury in the guilt phase of Doyle's trial was instructed, in Instruction No. 8, that "Murder of the First Degree is the willful, deliberate and premeditated killing of another human being." Jury Instructions, Exh. 154, Instruction No. 8 (ECF No. 172-10, p. 10). The jury was then given the *Kazalyn* instruction, as Instruction No. 9, as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

*Id.*, Instruction No. 9 (ECF No. 172-10, p. 11).

On his direct appeal, Doyle asserted the claim that the *Kazalyn* instruction violated his federal constitutional rights (*see* Appellant's Opening Brief, Exh. 172, pp. 30–35 (ECF No. 173-10, pp. 54–59)), and the Nevada Supreme Court ruled as follows:

> *The premeditation jury instruction.*
>
> Doyle requests that this court overrule the holding in *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992), as it relates to "premeditation" as an element of first-degree murder. In *Powell,* this court held that, as long as the jury instruction comports with the standard announced in *Briano v. State,* 94 Nev. 422, 581 P.2d 5 (1978), there is no need to define separately "deliberateness." We conclude that this court's reasoning in *Powell* remains sound and that there is, therefore, no need for this court to revisit the meaning of the phrase "deliberate, premeditated, and willful" at this time.

*Doyle*, 112 Nev. at 900; 921 P.2d at 915.

Doyle argues that the *Kazalyn* instruction was unconstitutional because it collapsed three elements of first-degree murder—"willful, deliberate and premeditated"—into one element: "premeditated." Doyle contends this eliminated elements of the crime from consideration by the jury, in violation of his rights under the Fourteenth Amendment. *See Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *In re*

1    *Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused

2    against conviction except upon proof beyond a reasonable doubt of every fact

3    necessary to constitute the crime with which he is charged."); *Evanchyk v. Stewart*, 340

4    F.3d 933, 939 (9th Cir. 2003) ("It is a violation of due process for a jury instruction to

5    omit an element of the crime.").

6        In *Polk v.* Sandoval, 503 F.3d 903 (9th Cir. 2007), the Ninth Circuit Court of

7    Appeals held that the *Kazalyn* instruction was unconstitutional because it relieved the

8    State "of its burden of proving every element of first-degree murder beyond a

9    reasonable doubt." Subsequently, however, in *Babb v. Lozowsky*, 719 F.3d 1019 (9th

10   Cir. 2013), the court determined that its holding in *Polk* is no longer good law in light of

11   the intervening ruling of the Nevada Supreme Court in *Nika v. State*, 124 Nev. 1272,

12   198 P.3d 839 (2008), that *Byford* represented a change, rather than a clarification, of

13   Nevada law. *See Babb*, 719 F.3d at 1029. In light of *Nika* and *Babb*, it is now well-

14   established that in cases in which the conviction became final after *Powell* but before

15   *Byford*—that is, between 1992 and 2000—the *Kazalyn* instruction accurately stated

16   Nevada law and did not violate the defendant's federal constitutional rights. *See Babb*,

17   719 F.3d at 1029–30; *see also Riley v. McDaniel*, 786 F.3d 719, 723–24 (9th Cir. 2015).

18   Doyle's conviction became final in 1997; therefore, Doyle's claim in Ground 9A1 is

19   foreclosed by *Babb.* The *Kazalyn* instruction was not unconstitutional, and the Nevada

20   Supreme Court's ruling to that effect was not contrary to, or an unreasonable application

21   of, *Sandstrom*, or *In re Winship*, or any other United States Supreme Court precedent.

22       In addition, Doyle takes issue with Jury Instruction No. 10 given at his trial, which

23   was as follows:

24           There is a kind of murder which carr[ies] with it conclusive evidence
             of premeditation and malice aforethought. This class of murder is murder
25           committed in the perpetration or attempted perpetration of Sexual Assault
             or Kidnapping. Therefore, a killing which is committed in the perpetration
26           of the felony of Sexual Assault or Kidnapping is deemed to be Murder in
             the First Degree, whether the killing was intentional, unintentional or
27           accidental. This is called the Felony-Murder rule.

28

> The specific intent to commit Sexual Assault or Kidnapping must be proven beyond a reasonable doubt.

Jury Instructions, Exh. 154, Instruction No. 10 (ECF No. 172-10, p. 12). Doyle claims, with no further analysis, that this instruction "confusingly instructed the jury felony murder carried 'with it conclusive evidence of premeditation and malice aforethought'" and "misguided the jury into analyzing felony murder as a form of premeditated, deliberated, and willful murder despite the fact felony murder was a completely distinct theory of first-degree murder." Second Amended Petition (ECF No. 265), p. 189. The Nevada Supreme Court has approved of an instruction much like Instruction No. 10. *See Crawford v. State*, 121 Nev. 744, 749, 121 P.3d 582, 585–86 (2005). And, Doyle does not cite any authority for the proposition that this instruction violated his federal constitutional rights. The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

The Court will deny Doyle relief on Ground 9A1.

Ground 9A3

In Ground 9A3, Doyle claims that his federal constitutional rights were violated, in the guilt phase of his trial, as a result of improper jury instructions, because "[t]he trial court's malice aforethought instruction was improper." Second Amended Petition (ECF No. 265), pp. 196–97.

The jury instructions given in Doyle's case instructed the jury that "[m]urder is the unlawful killing of a human being, with malice aforethought, whether express or implied." Jury Instructions, Exh. 154, Instruction No. 4 (ECF No. 172-10, p. 6). The instructions went on to define "malice aforethought." *Id.*, Instruction No. 5 (ECF No. 172-10, p. 7). Then, Instruction No. 6, stated:

> Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

> Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

*Id.*, Instruction No. 6 (ECF No. 172-10, p. 8). Doyle contends that Instruction No. 6 "relieved the prosecut[ion] of their burden to prove each element beyond a reasonable doubt, subverted the presumption of innocence, and invaded the jury's fact-finding province." Second Amended Petition (ECF No. 265), p. 196. He contends the instruction "foreclosed any independent jury consideration" of whether the prosecution proved malice aforethought. *Id.* at 197. He contends that the instruction "created a reasonable likelihood that the jury convicted Mr. Doyle of first-degree murder without any rational basis for distinguishing between first-degree and second-degree murder." *Id.*

Doyle asserted this claim on his direct appeal (*see* Appellant's Opening Brief, Exh. 172, pp. 36–37 (ECF No. 173-10, pp. 60–61)), and the Nevada Supreme Court ruled as follows:

> *The "implied malice" jury instruction.*
>
> The jury was instructed regarding implied malice according to the statutory definition provided in NRS 200.020(1) and (2). Doyle contends that the instruction created a mandatory presumption in favor of the State and improperly shifted the burden of proof to the defendant.
>
> [Footnote 9: NRS 200.020 provides:
>
> 1. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
>
> 2. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned or malignant heart.]
>
> In *Ruland v. State*, 102 Nev. 529, 728 P.2d 818 (1986), this court expressly held that the above-mentioned jury instruction does not constitute an impermissible mandatory presumption. *See also Guy v. State*, 108 Nev. 770, 839 P.2d 578 (1992) (identical instruction held proper, although mandatory presumption issue not discussed). This court concluded that the instruction was constitutionally permissible because the instruction merely defines "implied malice" rather than directing the jury to find any presumed fact against the accused. *Ruland*, 102 Nev. at 533, 728 P.2d at 820–21.
>
> Doyle notes that the opposite conclusion was reached in *Fulghum v. Ford*, 850 F.2d 1529 (11th Cir.1988), *cert. denied*, 488 U.S. 1013, 109 S.Ct. 802, 102 L.Ed.2d 793 (1989), a case that involved statutory language identical to that contained in NRS 200.020. In *Fulghum*, the Eleventh Circuit Court of Appeal[s] found that the implied malice instruction, standing alone, would have been constitutionally infirm. 850

F.2d at 1534 (citing *Lamb v. Jernigan*, 683 F.2d 1332 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983)). However, the court concluded that any ambiguity regarding the State's burden of proving malice beyond a reasonable doubt was cured by the presence of a "strong" circumstantial evidence instruction. *Fulghum*, 850 F.2d at 1535 (citing *Lamb*); *see also Francis v. Franklin*, 471 U.S. 307, 318–19, 105 S.Ct. 1965, 1973–74, 85 L.Ed.2d 344 (1985) ("[T]he jury charge taken as a whole ... explained the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion.").

In *Fulghum*, the jury instructions provided: "To warrant a conviction upon circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." 850 F.2d at 1535. The jury instructions in the present case contained no such language. Jury Instruction No. 32, however, provided that "[t]he defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged." We believe that this court's reasoning in *Ruland* remains sound. We also believe that, taken as a whole, the jury instructions in this case were sufficient to cure any ambiguity that may have existed in the challenged jury instruction regarding the State's ultimate burden of proving malice beyond a reasonable doubt. Accordingly, we conclude that under either *Ruland* or *Fulghum*, the challenged instruction was not improper.

Finally, we agree with the State that, even if this court finds that the instruction regarding implied malice impermissibly shifted the State's burden of proving implied malice, the error was harmless because it is clear in this case that the jury actually rested its verdict on the ample evidence of express malice. *See Scott v. State*, 92 Nev. 552, 556, 554 P.2d 735, 738 (1976) ("The jury returned a verdict of murder in the first degree. They must have found beyond a reasonable doubt that [the defendant] murdered [the victim] deliberately, willfully, and with premeditation. These elements of the crime conclusively established express malice.... Thus, implied malice played no part in this case."); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see generally Yates v. Evatt*, 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) ("[T]he issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption.").

[Footnote 10: *Yates* sets out in detail the methodology for determining harmless error, consistent with the Due Process Clause, with respect to unlawful presumptions.]

*Doyle*, 112 Nev. at 900–02; 921 P.2d at 915–16. The Nevada Supreme Court's ruling was reasonable.

First, this Court finds meritless Doyle's claim that Instruction No. 6 blurs the distinction between first- and second-degree murder. The jury instructions, read in their

entirety, sufficiently distinguished between the two degrees of murder. *See* Jury Instructions, Exh. 154, Instruction Nos. 7–13 (ECF No. 172-10, pp. 9–15).

Furthermore, this Court finds reasonable the Nevada Supreme Court's ruling that Doyle could not have been prejudiced by Instruction No. 6. The jury found Doyle guilty of first-degree murder because it found either that the murder was committed in the course of a kidnapping—felony murder—or that the murder was willful, deliberate and premeditated. If the former, "by law the malice required for murder is supplied by the intent to commit an enumerated felony." *Collman v. State*, 116 Nev. 687, 715, 7 P.3d 426, 444 (2000). If the latter, then the elements of willfulness, premeditation and deliberation conclusively established express malice. *See Scott v. State*, 92 Nev. 552, 556–57, 554 P.2d 735, 738 (1976). Therefore, it is beyond dispute that the jury found malice, and that any error in Instruction No. 6 was harmless.

The Nevada Supreme Court's denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence. The Court will deny Doyle relief on Ground 9A3.

Grounds 17A and 17B

In Ground 17A, Doyle claims that his federal constitutional rights were violated because "[t]here was insufficient evidence for the jury to convict Mr. Doyle of conspiracy to commit murder." Second Amended Petition (ECF No. 265), pp. 290–93. In Ground 17B, Doyle claims that his federal constitutional rights were violated because "[t]here was insufficient evidence of first-degree kidnapping." *Id.* at 293–94.

The Due Process Clause of the Fourteenth Amendment precludes a criminal conviction "except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). Sufficient evidence supports a conviction if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Id.* at 319. Insufficient evidence claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). First, an appellate court may set aside a verdict on direct appeal, on account of insufficient evidence, "only if no rational trier of fact could have agreed with the jury." *Id.* (citing *Cavazos v. Smith*, 565 US. 1, 2 (2011)). Second, on habeas review, a federal court may only overturn a state court ruling denying a sufficiency of the evidence claim if that decision was "objectively unreasonable;" the federal habeas court may not overturn the state-court decision "simply because the federal court disagrees with the state court." *Coleman*, 566 U.S. at 651 (citing *Cavazos*, 565 U.S. at 2). In considering a sufficiency of the evidence claim, the Court looks to state law to determine the substantive elements of the criminal offense. *See Jackson*, 443 U.S. at 324 n.16.

Doyle asserted these claims on his direct appeal (*see* Appellant's Opening Brief, Exh. 172, pp. 24–29 (ECF No. 173-10, pp. 48–53)), and the Nevada Supreme Court ruled as follows:

> *Sufficiency of the evidence.*
>
> Doyle contends that the evidence presented at trial was insufficient to establish his guilt of the charges of first-degree kidnaping, conspiracy to commit murder, and sexual assault. The standard of review for sufficiency of evidence upon appeal, in a criminal case, is whether the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt. *Edwards v. State*, 90 Nev. 255, 258–59, 524 P.2d 328, 331 (1974). It is the jury's function, not that of the reviewing court, to assess the weight of the evidence and determine the credibility of witnesses. *Walker v. State*, 91 Nev. 724, 726, 542 P.2d 438, 438–39 (1975).
>
> *1. First-degree kidnaping.*
>
> Doyle contends that the evidence adduced at trial does not support his conviction for first-degree kidnaping, arguing that sufficient evidence corroborating his admissions relative to the offense was lacking.
>
> The *corpus delicti* of a crime must be proven independently of the defendant's extrajudicial admissions. *Hooker v. Sheriff*, 89 Nev. 89, 506 P.2d 1262 (1973). Thus, before the jury could find that Doyle kidnapped Ebony Mason, a case of willful detention for the purpose of committing sexual assault or murder must have appeared from evidence other than Doyle's conversations with others. In *People v. Alcala*, 36 Cal.3d 604, 205

Cal.Rptr. 775, 685 P.2d 1126 (1984), cited by the State, the court described the nature and degree of independent proof required to corroborate a defendant's admissions:

> The independent proof may be circumstantial evidence ..., and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. If the independent proof meets this threshold requirement, the accused's admissions may then be considered to strengthen the case on all issues.

*Id*. 205 Cal.Rptr. at 785, 685 P.2d at 1136 (citations omitted). The court further stated:

> There need not be independent support for each fact testified to by the suspect witness; corroboration is sufficient for this purpose if it "tends to connect the defendant with the commission of the offense [charged] in such a way as reasonably may satisfy a jury that the [witness] is telling the truth." (*E.g.*, *People v. Holford* (1965) 63 Cal.2d 74, 82, 45 Cal.Rptr. 167, 403 P.2d 423, quoting *People v. Lyons* (1958) 50 Cal.2d 245, 257, 324 P.2d 556 (overruled on other grounds, *People v. Green*, [ ], 27 Cal.3d 1, 32–34, 164 Cal.Rptr. 1, 609 P.2d 468).) Circumstantial evidence is sufficient, "although such evidence 'is slight and entitled, when standing by itself, to but little consideration.'" (*Holford*, [ ], quoting *People v. McLean*, (1890) 84 Cal. 480, 482, 24 P. 32).

*Id*. 205 Cal.Rptr. at 785 n. 10, 685 P.2d at 1136 n. 10 (citations omitted). We conclude that sufficient circumstantial evidence of the offense of first-degree kidnaping exists to satisfy the *corpus delicti* doctrine.

The offense of first-degree kidnaping is defined in pertinent part, as follows:

> Every person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person for ransom, or reward, or for the purpose of committing sexual assault, extortion or robbery upon or from the person, or for the purpose of killing the person or inflicting substantial bodily harm upon him, or to exact from relatives, friends, or any other person any money or valuable thing for the return or disposition of the kidnaped person, ... is guilty of kidnaping in the first degree.

NRS 200.310(1). In addition, this court requires proof of asportation when the kidnaping is incidental to another offense where restraint of the victim is inherent with the primary offense. *Hutchins v. State*, 110 Nev. 103, 108, 867 P.2d 1136, 1139–40 (1994); *Clem v. State*, 104 Nev. 351, 354, 760 P.2d 103, 105 (1988), *overruled on other grounds*, *Zgombic v. State*, 106 Nev. 571, 798 P.2d 548 (1990). Asportation is not required, however, where the victim is physically restrained. *Clem*, 104 Nev. at 354, 760 P.2d

at 105. Also, the kidnaping is not incidental to the underlying offense if the restraint increased the risk of harm to the victim or had an independent purpose and significance. *Id.*

In the present case, Anderson testified at trial that he witnessed the victim voluntarily leave with Doyle and the others upon an offer to give her a ride home. Evidence of a struggle and the victim's savagely beaten body were eventually discovered at a secluded desert location nowhere near the victim's home. We believe that the evidence presented made it highly unlikely that Mason accompanied Doyle willingly to the death scene, and that, based on this evidence, the jury could reasonably have surmised that Doyle was telling the truth when he admitted to participation in the kidnaping. Moreover, the confinement and movement of the victim to a secluded, untravelled desert area was not merely incidental to the sexual assault and murder; it had the independent purpose and significance of substantially lessening the risk of detection.

Accordingly, we conclude that sufficient evidence was adduced at trial to establish the *corpus delicti* of first-degree kidnaping and, based on Doyle's admissions, Doyle's guilt beyond a reasonable doubt.

*2. Conspiracy to commit murder.*

Doyle contends that the evidence adduced at trial does not support his conviction for conspiracy to commit murder, arguing that sufficient evidence corroborating his admissions relative to the offense was lacking.

A conspiracy is an agreement between two or more persons for an unlawful purpose. *Peterson v. Sheriff*, 95 Nev. 522, 598 P.2d 623 (1979). A person who knowingly does any act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator; however, "[m]ere knowledge or approval of, or acquiescence in, the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to conspiracy." *State v. Arredondo*, 155 Ariz. 314, 317, 746 P.2d 484, 487 (1987). "[C]onspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties." *Gaitor v. State*, 106 Nev. 785, 790 n. 1, 801 P.2d 1372, 1376 n. 1 (1990) (quoting *State v. Dressel*, 85 N.M. 450, 451, 513 P.2d 187, 188 (1973)). In particular, a conspiracy conviction may be supported by "a coordinated series of acts," in furtherance of the underlying offense, "sufficient to infer the existence of an agreement." *Id.*

In addition, this court has held that to sustain a conviction of conspiracy, the prosecution is required to present proof, independent of the defendant's own admissions, that the defendant entered into an agreement with at least one other person; however:

> "[t]he corroborative evidence need not be sufficient, independent of the statements to establish the *corpus delicti* [but must] tend to establish the trustworthiness of the statement ... and provide substantial independent evidence that the offense has been committed." *United States v. Todd*, 657 F.2d 212, 216 (8th Cir.1981), quoting *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954) and

*Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954).

*Myatt v. State*, 101 Nev. 761, 763, 710 P.2d 720, 722 (1985). In fact, proof of even a single overt act may be sufficient to corroborate a defendant's statement and support a conspiracy conviction. *United States v. Todd*, 657 F.2d 212, 216 (8th Cir.1981) (citing *United States v. McCarty*, 611 F.2d 220, 223 (8th Cir.1979), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980)).

    In the present case, the State presented competent evidence that Doyle left the Atkins residence together with the victim and the Atkins brothers. The area where the victim's body was eventually found, and the nearby area where a struggle likely occurred, contained three distinct types of footwear impressions, one of which matched a pair of shoes retrieved from Doyle's residence. The victim's body also bore at least two, distinctly patterned contusions, one of which matched the pattern linked to the shoes found at Doyle's apartment and a second design. None of the treadwear impressions or contusions matched the pair of women's athletic shoes also found at the murder scene. This evidence, although perhaps insufficient in itself to establish the *corpus delicti* of conspiracy, provides substantial independent evidence of a conspiracy and tends to establish the trustworthiness of Doyle's inculpatory statements regarding the alleged conspiracy. Accordingly, we conclude that Doyle's conviction for conspiracy to commit murder was supported by sufficient evidence.

*Doyle*, 112 Nev. at 891–95; 921 P.2d at 910–12.

    The Court determines that these rulings by the Nevada Supreme Court were not unreasonable. Fairminded jurists could reasonably argue that the circumstantial evidence described by the Nevada Supreme Court satisfied Nevada's corroborating evidence and *corpus delicti* requirements, and that the evidence overall, including Doyle's statements, satisfied the *Jackson* standard.

    The Court will deny Doyle habeas corpus relief on Grounds 17A and 17B.

Ground 19

    In Ground 19, Doyle claims that his conviction and death sentence are invalid under the federal constitution "because of the cumulative effect of the errors in this case." Second Amended Petition (ECF No. 265), pp. 298–301.

    The Court determines that there was no constitutional error. There is not, therefore, error to be considered cumulatively. The Court will deny Doyle relief on Ground 19.

Motion for Evidentiary Hearing

In his motion for evidentiary hearing (ECF No. 323), Doyle requests an evidentiary hearing with respect to his arguments that he can overcome the procedural defaults of certain of his claims by showing ineffective assistance of counsel in his first state habeas action, and he requests an evidentiary hearing on his *Batson* claim in Ground 1.

Evidentiary hearings are authorized in federal habeas corpus actions by Rule 8 of the Rules Governing § 2254 Cases. However, an evidentiary hearing is not required if the issues can be resolved by reference to the state court record. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise."); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). Moreover, "an evidentiary hearing is not required if the claim presents a purely legal question and there are no disputed facts." *Beardslee v. Woodford*, 358 F.3d 560, 585 (9th Cir. 2004); *see also Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

As is discussed above, in the discussion of Ground 1, the Court resolves the claims in Ground 1 without need for an evidentiary hearing.

As for Doyle's arguments under *Martinez*, the Court determines that there, too, Doyle does not show an evidentiary hearing to be necessary. The Court resolves the *Martinez* questions based on the briefing of the parties and on the record before the Court, without need for further evidentiary development. It is plain from the record that Doyle's claims of ineffective assistance of trial counsel in Grounds 1, 3E, 3J and 6A8 are insubstantial. Doyle does not indicate with any specificity what evidence he would present at an evidentiary hearing, and he does not proffer any such evidence, to show otherwise.

Doyle's motion for an evidentiary hearing will be denied.

1

Certificate of Appealability

2    The standard for the issuance of a certificate of appealability requires a

3  "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The

4  Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

5          Where a district court has rejected the constitutional claims on the
           merits, the showing required to satisfy § 2253(c) is straightforward: The
6          petitioner must demonstrate that reasonable jurists would find the district
           court's assessment of the constitutional claims debatable or wrong. The
7          issue becomes somewhat more complicated where, as here, the district
           court dismisses the petition based on procedural grounds. We hold as
8          follows: When the district court denies a habeas petition on procedural
           grounds without reaching the prisoner's underlying constitutional claim, a
9          COA should issue when the prisoner shows, at least, that jurists of reason
           would find it debatable whether the petition states a valid claim of the
10         denial of a constitutional right and that jurists of reason would find it
           debatable whether the district court was correct in its procedural ruling.

11

12  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

13  1077–79 (9th Cir. 2000).

14    Applying the standard articulated in *Slack*, the Court finds that a certificate of

15  appealability is warranted with respect to the question whether the Court's scheduling

16  orders and uncertainty in the law regarding the relation back of amended petitions

17  warrants equitable tolling of the statute of limitations in this case, an issue that was

18  addressed in the Court's order resolving Respondents' motion to dismiss (ECF No. 301)

19  and in the Court's order denying the motion for reconsideration of that order (ECF No.

20  331). The Court determines that a certificate of appealability is also warranted with

21  respect to Ground 1. Beyond those issues, the Court will deny Doyle a certificate of

22  appealability.

23  Conclusion

24    **IT IS THEREFORE ORDERED** that Petitioner's Motion for Evidentiary Hearing

25  (ECF No. 323) is **DENIED**.

26    **IT IS FURTHER ORDERED** that Petitioner's Second Amended Petition for Writ

27  of Habeas Corpus (ECF No. 265) is **DENIED**

28

**IT IS FURTHER ORDERED** that Petitioner is granted a certificate of appealability with respect the question whether the Court's scheduling orders and uncertainty in the law regarding the relation back of amended petitions warrants equitable tolling of the statute of limitations in this case and with respect to Ground 1 of his second amended habeas petition. With respect to all other issues, the Court denies a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

DATED THIS 22nd day of October, 2020.

ROBERT C. JONES,
UNITED STATES DISTRICT JUDGE